ADOPTION OF RHONA.[1]

No. 04-P-1213.

Suffolk. January 7, 2005. - March 9, 2005.

Present: GELINAS, DOERFER, & KAFKER, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption. *Practice, Civil,* Findings by judge, Assistance of counsel.

Discussion of the standard of review applicable to proceedings to dispense with parental consent to adoption. [124-126]
Discussion of the consideration that a judge hearing a proceeding to dispense with parental consent to adoption must give to the formation of strong bonds that might exist between preadoptive parents and the child at issue, as well as the biological parents' ability to cope with the resulting trauma from severing such a bond. [126-127]
In a proceeding to dispense with parental consent to adoption, the judge was warranted in finding the parents unfit and unable to provide for the best interests of the child, based on current evidence of the parents' inability to provide for the child's documented needs arising out of her separation from her life-long preadoptive parents. [127-129]
At a proceeding to dispense with parental consent to adoption, the judge's findings were supported by the evidence and were clear and convincing, despite the judge's adoption nearly verbatim of the proposed findings of the Department of Social Services [129-130]; moreover, the father did not receive ineffective assistance of counsel, where counsel's tactical decisions were not manifestly unreasonable [130].

PETITION filed in the Boston Division of the Juvenile Court Department on October 26, 1994.

After review by this court, 57 Mass. App. Ct. 479 (2003), further proceedings were had before *Jose Sanchez,* J.

*Henry C. Porter* for the father.

*Shelli C. Hamer* for the mother.

*Lynne M. Murphy* for Department of Social Services.

*Lisa M. Sheehan* for the child.

[1]The names of the three children referenced in the opinion are pseudonyms.

DOERFER, J. This is an appeal arising out of proceedings held after a remand by this court in the case of *Adoption of Rhona*, 57 Mass. App. Ct. 479 (2003). In that case we held that there was insufficient evidence that Rhona's biological mother and father did not have a current ability to parent Rhona. We determined that the trial court had relied on stale evidence of the mother's substance abuse; ignored evidence of the mother's sobriety; and did not consider evidence of the mother's ability to parent Nancy, a younger sibling of Rhona who was in the mother's custody.[2] We also held that the trial court did not make the necessary findings relating to the bonding between Rhona and her preadoptive parents, or assess the seriousness of the psychological harm that would result from the severance of those bonds and whether the means available to the mother to alleviate that psychological harm would be inadequate. We required the trial court judge to conduct further proceedings to determine the current fitness of the mother and father as parents and how the best interests of Rhona would be served. *Id.* at 493.

At the conclusion of those proceedings, the trial judge concluded that the biological parents were currently unfit and that they would be unable to provide adequately for the psychological needs of Rhona that would be caused by the severance of the bond between her and her foster parents, who were her preadoptive parents. The judge found that Rhona's interests would best be served by remaining with her preadoptive family and issued a decree pursuant to G. L. c. 210, § 3, dispensing with parental consent to adoption.

On appeal the mother claims that the trial judge continued to rely on stale evidence and that he failed to take into account evidence that the mother had conquered her addiction without the need for programmatic intervention or therapy. The mother also challenges the judge's determination that, because of her own mental health issues, she would be unable to provide adequately for the severe psychological distress to Rhona that would result from Rhona's separation from her long-term preadoptive parents. The mother disputes the sufficiency of the

---

[2]Gail, an older sibling, was also in the mother's custody at that time.

evidence on several other related issues and criticizes the judge's findings as merely a wholesale adoption of findings proposed by the Department of Social Services (department). She challenges the sufficiency of the subsidiary findings of the judge, contending that they do not justify his conclusions as to fitness and best interests of the child.

The father claims on appeal that he did not receive effective assistance of counsel, that the judge disregarded positive evidence of his successful parenting of another child, and that insufficient evidence of unfitness exists, especially where there is no connection between his conduct and harm to the child. The father also argues that the trial judge's findings are not entitled to deference based upon various theories, including that they mirror the proposed findings submitted by the department.

We first summarize the evidence presented at the remand hearing.[3] We next review the application of *Adoption of Katherine*, 42 Mass. App. Ct. 25 (1997), to the facts found by the judge relating to the impact of separation on Rhona from her preadoptive parents and the inability of the biological parents to provide for her needs based upon the evidence of the parents' particular limitations and problems. We conclude that the judge was warranted in finding the parents unfit, based on current, not stale, evidence of their inability to provide for Rhona's documented needs arising out of her separation from her life-long preadoptive parents. We dispose of the remaining issues in favor of the department and Rhona. Because there was sufficient evidence to support the judge's relevant findings, and because the judge's findings of fact and reasonable inferences therefrom support his decision under G. L. c. 210, § 3, we affirm the decree.

1. *Background and prior proceedings.* Rhona, currently ten years old, was born on September 21, 1994, and tested positive for cocaine, leading to the filing of a G. L. c. 51A report. Subsequently, the department filed a care and protection petition on October 26, 1994, and received temporary custody of

---

[3]Some evidence presented at the first trial was taken into consideration by the judge on remand by way of background.

Rhona.[4] Since that time, Rhona has been in the custody of the same preadoptive family,[5] except for a four-month period in 1996 when Rhona briefly returned to the custody of the mother. The father had no contact with Rhona for approximately the first two years of her life. But in June, 1996, the mother allowed the father unsupervised visits with the child, without the department's knowledge or permission. After the mother suffered a relapse in September, 1996, Rhona was again removed and returned to the care of her preadoptive parents, where she has remained.

In March, 1997, the department changed the goal from reunification to adoption and petitioned the judge to amend the pleadings to include dispensing with parental consent to adoption. Between 1996 and 1998, the mother and father had sporadic visits with Rhona. However, due to a confrontation involving the department, the parents and the preadoptive family that occurred at a visitation on October 30, 1998, the department petitioned for, and the judge approved, termination of parental visitation.[6]

The Juvenile Court judge conducted a trial on the merits spanning fifteen days between May, 1997, through August, 1998. On September 27, 2000, the judge issued his findings, awarded permanent custody of Rhona to the department, and terminated the mother and father's parental rights. The mother and father appealed, and on February 28, 2003, this court vacated the decree and remanded the case to Juvenile Court for further proceedings. The Juvenile Court held the remand trial during six days in October, 2003. On February 27, 2004, the judge issued his findings,[7] again dispensing with parental consent. The mother and father filed timely appeals.

---

[4]The department also gained custody of Rhona's then twelve year old sister, Gail.

[5]Rhona's original placement was with her current preadoptive grandmother. In July, 1995, when she was ten months old, Rhona was moved to the home of the preadoptive grandmother's daughter and son-in-law.

[6]The mother and father had not seen Rhona for approximately five years, until July, 2003, when the department set up visits for purposes of the remand proceedings.

[7]The forty-page findings included 163 findings of fact and thirty-two conclusions of law. The judge heard testimony from twelve witnesses and admitted seventeen exhibits.

2. *Remand proceedings.* Although the mother and father challenge many of the conclusions and inferences made by the trial judge and the significance of many of the subsidiary facts to the ultimate issues in the case, there was adequate evidence (indeed, it was uncontested) that certain events and behaviors occurred after the case was remanded by this court.[8]

a. *Reopening of the case and renewed visitation.* Rhona, when she learned that the case was to be reopened, developed psychological problems and exhibited adverse changes in her behavior at home and at school. She broke into tears and said she did not want to go back to her biological parents. She developed headaches, loss of appetite, abdominal pains, sleep disturbances, nightmares, vomiting, and anxiety. Her teacher reported that she was having a hard time emotionally at school and often cried or acted out in anger, which was a change from her prior behavior. The department arranged for family therapy for Rhona and her foster parents.

The department also arranged four visits between Rhona and the mother and father between June, 2003, and October, 2003.[9] At first she said she did not want to see the mother and father, but later agreed to the visits so long as the visits were supervised. Following the initiation of the visits, Rhona refused to sleep in her own bed and slept with her preadoptive parents. Dr. Gordetsky, who was an expert agreed upon by the parties to evaluate Rhona's current needs, observed the visits. In addition, Dr. Pinderhughes, an expert in child psychology, attachment, and adoption, continued to see Rhona at the request of the department to assist her and to report on her reactions to the renewed visitations.

Rhona did not react well during the visits. She failed to make eye contact with the mother. She was nervous. She acted uncharacteristically sassy and sarcastic in the presence of the

---

[8]As to the evidence on other topics, much of the appellate argument of the mother and father is no more than a criticism of the credibility determinations made by the judge about the testimony of various witnesses or a disagreement about the inferences drawn by the judge from the evidence. Our review of the record does not support the argument that the judge's resolution of these matters was an abuse of discretion.

[9]Nancy, as well as other biological family members, also attended some of these visits.

mother and father. During visits, Rhona became very upset
when her parents continually corrected her when she referred to
her preadoptive parents as her mother and father. After being
asked if she wanted to live with her biological family, Rhona
responded that she did not and then curled up on the floor in a
fetal position. Thereupon, the mother became emotionally
overwhelmed and unable to continue with the visit, needing a
"time out."

Neither the mother or father attempted to comfort Rhona.
The mother consistently put emphasis on her own psychological
state, instead of attending to Rhona's emotional needs. The
judge found the father was unable to appreciate how his present
and past actions negatively affected Rhona. During an October,
1998, visit, the father had yelled at the foster grandmother caus-
ing fear in the then four year old Rhona and resulting in the
suspension of visits. When asked about that visit after remand,
the father still did not comprehend how his actions had affected
Rhona. Other facts indicating lack of appropriate responses by
the mother and father were detailed in the judge's findings,
including a failure by both parents to heed recommendations of
professionals to take a gradual approach to the renewed visits.

Nancy did not do well with the visits with Rhona either. The
mother and father did not appear to understand Nancy's
emotional needs created by the visits.

The lack of bonding between Rhona and the mother and
father, to whom she refers by first names, was well documented
in the evidence. The evidence also demonstrated the strong af-
fection and attachment between Rhona and her preadoptive
parents, whom she calls "mommy" and "daddy."

b. *Service plans for the mother and father.* After reopening
the case, the department again provided services to the mother
and father. The mother did not comply with four of the six tasks
in her plan: (1) she refused to attend individual therapy; (2) she
failed to meet with her therapist or psychiatrist; (3) she did not
arrange for Nancy to attend therapy; and (4) she did not meet
with her social worker monthly.

Before remand, the mother had been diagnosed with depres-
sion and had not participated in therapy for that condition
between 1997 and 2002. She discontinued taking medication

without the approval of her physician. In January, 2003, she was diagnosed with bipolar disease. There was evidence, relied upon by the judge, to the effect that bipolar disease is a life-long condition based on a chemical imbalance that requires both medication and weekly therapy. Although the mother attended one session, she did not attend five other sessions with a psychiatric social worker that had been scheduled in the first six months of 2003. She attended two scheduled sessions with a psychiatric nurse who was trying to monitor the effectiveness of the mother's medications, but missed four other scheduled sessions.

The importance of attending therapy sessions was explained to the mother by her social worker. The mother admitted that renewed visitation with Rhona and the reopening of the case had been difficult for the mother and that therapy would be beneficial. The mother also admitted to a social worker that she was feeling overwhelmed by cleaning and providing for her family. But she still failed to attend individual therapy. She gave excuses which the judge did not find credible. She also knew that attendance at therapy and compliance with her service plan would help her achieve reunification with Rhona, if only by demonstrating to the department and the judge her willingness to take steps to comply with her plan.

Nancy had been diagnosed with attention deficit hyperactivity disorder. She, at the department's suggestion, was participating in therapy from the fall of 2001 to the fall of 2002. When the mother moved to a new town, she discontinued Nancy's medication without the approval of a physician and did not arrange for Nancy's therapy to be continued. Nancy is saddened by Rhona's placement in foster care and feels anger towards her mother. She is also competitive and jealous toward Rhona and acted out after Rhona's visits in the fall of 2003. The mother admitted that Nancy would benefit from therapy. Her excuses for not scheduling therapy were regarded as inadequate by the judge.

The father also did not meet the requirements set forth in the service plan prepared for him for the period of August 1, 2003, to February 1, 2004. He did not comply with three of the identified tasks designed to address issues regarding potential

reunification: (1) the father refused to participate in individual therapy; (2) he did not participate in family therapy; and (3) he did not meet monthly with a department social worker. While the judge acknowledged the father's conflicting statements about his willingness to participate in requested services, the judge found that the father did not have any actual intention of complying with the recommended services designed to strengthen his parenting abilities and his ability to understand Rhona's needs.

Failure to comply with the department's service plan is consistent with the father's history of wilfully disregarding recommendations of professionals. The father's past violations of restraining orders, failure to attend court ordered anger management classes, and failure to participate in a bonding evaluation at Massachusetts General Hospital are indicative of his lack of compliance. Moreover, as noted *supra*, the father failed to abide by recommendations of the supervising doctor that he move gradually toward reunification. The judge credited expert testimony that the father has limited emotional and cognitive ability to view things from Rhona's perspective and lacks the capacity to inhibit his own feelings, which hampers his ability to deal with Rhona's special needs. Given that, the judge found the father would not follow through with services recommended for himself or Rhona, which would place Rhona at risk of abuse and neglect.

3. *Standard of review.* To dispense with parental consent to adoption, the judge must determine whether the parent is currently unfit, *Adoption of Frederick*, 405 Mass. 1, 4 (1989), and whether terminating parental rights would be in the best interests of the child. *Adoption of Helen*, 429 Mass. 856, 859 (1999). *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262 (1996) ("Fitness to act as a parent, in statutory and decisional context, involves inquiry not only into the capacity of the biological parent but into the best interests of the child"). See G. L. c. 210, § 3. When making this determination, subsidiary findings of fact must be supported by a preponderance of the evidence, with the ultimate determination of unfitness based upon clear and convincing evidence. *Adoption of Daniel*, 58 Mass. App. Ct. 195, 201 (2003). *Adoption of Helen, supra. Adoption of*

*Kimberly*, 414 Mass. 526, 528-529 (1993). This court will not disturb the trial judge's findings unless clearly erroneous. *Adoption of Hugo*, 428 Mass. 219, 224 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999). The judge's assessment of the weight of the evidence and witness credibility is accorded substantial deference. *Custody of Two Minors*, 396 Mass. 610, 618 (1986). *Adoption of Peggy*, 436 Mass. 690, 702, cert. denied sub nom. *S.T.* v. *Massachusetts Dept. of Social Servs.*, 537 U.S. 1020 (2002).

The concept of unfitness is a fact-based assessment, which cannot be applied in the abstract. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 125 (1984). It "requires careful consideration, on the facts of a given case, of the capacity of the parents to care for their children." *Ibid.* "Parental unfitness must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." *Adoption of Mary*, 414 Mass. 705, 711 (1993). Further, "the assessment of parental fitness must focus on the children actually involved in the proceedings, with their specific needs, interests and requirements, and not on some hypothetical child or children." *Care & Protection of Olga*, 57 Mass. App. Ct. 821, 830 (2003).

"[T]he central judgment does not concern the [parent's] merits or demerits, but whether, in all the circumstances (including consideration of those merits or demerits), he [or she] has the capacity to act as a fit parent." *Adoption of Nicole*, 40 Mass. App. Ct. at 262. Thus, "[t]he specialized needs of a particular child when combined with the deficiencies of a parent's character, temperament, capacity, or conduct may clearly establish parental unfitness." *Adoption of Warren*, 44 Mass. App. Ct. 620, 625-626 (1998), quoting from *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. at 125. A mental disorder is relevant where "it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs." *Adoption of Frederick*, 405 Mass. at 9. See *Adoption of Saul*, 60 Mass. App. Ct. 546, 554 (2004) (acknowledging connection

between mother's inability to parent and her mental illness). Evidence of parents' refusal to cooperate with the department, including failure to maintain service plans and refusal of counseling programs, is relevant to the determination of unfitness. See generally *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987). Further, a ten year old child's preference, while not dispositive, properly may be considered. *Adoption of Nancy*, 443 Mass. 512, 518 (2005).

4. *The issues surrounding bonding and the determination of unfitness.* General Laws c. 210, § 3(c), sets forth fourteen factors a judge must consider in determining parental fitness. *Adoption of Daniel*, 58 Mass. App. Ct. at 201. One factor addresses the formation of a strong bond between the preadoptive parents and the child, as well as the biological parents' ability to cope with the resulting trauma from severing that bond. General Laws c. 210, § 3(c)(vii), inserted by St. 1992, c. 303, § 5, states that the judge should consider whether,

> "because of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker, the bond has existed for a substantial portion of the child's life, the forced removal of the child from the caretaker would likely cause serious psychological harm to the child and the parent lacks the capacity to meet the special needs of the child upon removal."

Thus, while judges are required to consider the bond between the child and the preadoptive parents, that bond must be addressed in conjunction with consideration of the psychological harm to the child resulting from the child's removal from the preadoptive home and the biological parents' ability to address that resulting harm. In *Adoption of Katharine*, 42 Mass. App. Ct. at 30 n.9, we noted that the 1992 amendment to G. L. c. 210, § 3(c), permits more emphasis on bonding than prior decisional law, thus bringing "Massachusetts law a shade closer to legal commentators who have urged the primacy of psychological bonds." We interpreted G. L. c. 210, § 3(c)(vii), to require a judge to make certain explicit findings when bonding and the

resulting trauma due to severing such an attachment becomes a primary consideration "in assessing parental unfitness":

> "To the extent that traumatic severance of bonds with a substitute caretaker [becomes] a decisive factor, a judge would be bound in findings to describe the nature of the bonds formed, why serious psychological harm would flow from the severance of those bonds, what means to alleviate that harm [have] been considered, and why those means [have been] determined to be inadequate."

*Adoption of Katharine, supra* at 30-31. In addition to findings addressing these specified requirements, expert testimony may be necessary. See *Adoption of Rhona*, 57 Mass. App. Ct. at 492-493; *Adoption of Daniel*, 58 Mass. App. Ct. at 203.[10]

5. *Discussion.* While the judge claimed seven factors from G. L. c. 210, § 3(*c*), were applicable to this case, it is clear that the ultimate determination of unfitness rested primarily on factor (vii), see *supra.* It is equally apparent that the judge, relying upon expert testimony, met the *Katharine* criteria as required on remand. First, the judge adequately described the nature of the bonds formed between Rhona and her preadoptive parents: evidence supports the judge's finding that Rhona "is very bonded and securely attached to" her preadoptive parents, with whom she has lived for most of her ten years and whom she views as her "mommy" and "daddy." The judge made many findings relating to the loving and supportive bond that exists.

---

[10]While the judge is required to consider the bond between the child and preadoptive parents, bonding cannot be the sole factor in determining whether parental rights should be terminated. See *Adoption of Nicole*, 40 Mass. App. Ct. at 262-263; *Adoption of Rhona*, 57 Mass. App. Ct. at 492; *Adoption of Daniel*, 58 Mass. App. Ct. at 196 (permitting judge to consider bonding with long-term preadoptive parents as factor that, "while never sufficient by itself," supports termination of parental rights). See also *Adoption of Hugo*, 428 Mass. at 230. The reasoning is that, if bonding between the preadoptive parents and the child becomes the dispositive consideration, then the threshold for a finding of unfitness would be unacceptably lowered, since bonding frequently occurs between a child and his or her preadoptive parents. *Care & Protection of Three Minors*, 392 Mass. 704, 716 n.18 (1984) ("Too often the claim that bonding justifies adoption is the result of a self-fulfilling prophecy"). See *Adoption of Hugo, supra*; *Adoption of Katharine*, 42 Mass. App. Ct. at 30. Therefore, bonding will not "automatically trump the rights of the biological parents." *Adoption of Katharine, supra.*

It is clear that Rhona turns to her preadoptive parents "for comfort during times of stress and anxiety; she trusts them and depends on them to take care of her basic and emotional needs." The preadoptive parents are "very dedicated to caring for [Rhona] and have expressed an interest in adopting her since [she] was six months old. They both have a secure attachment with [her]." The preadoptive parents are "concerned, caring, responsive parents who attend all meetings [at Rhona's school] and are supportive of [Rhona]." Rhona receives "instant comfort and reassurance" from her preadoptive parents.

Second, serious psychological harm would flow from the severance of the bonds between Rhona and her preadoptive parents. Following the reopening of the case and renewed visitation, Rhona, as noted *supra*, evinced worrisome behavior: she began having trouble sleeping and had nightmares when she did sleep; she developed abdominal pain and headaches; she lost her appetite and began vomiting; and she became anxious. In school, she became emotionally upset and began crying and acting out in anger. The judge found that, in contrast to the secure attachment with her preadoptive parents, no attachment exists between Rhona and the mother or father. The judge credited expert testimony and found that Rhona was "a medically, neurologically, and psychologically vulnerable child," who has already exhibited severe stress stemming from the reunification effort. Evidence illustrates that Rhona meets the criteria for depression in children, caused by renewed contact with the mother and father. If placed in the care of the mother or father, Rhona "would suffer long lasting and severe psychological harm in the form of depression, despair, anger and acting out behavior, as well as physical symptoms requiring medical intervention." Further, the severe psychological harm to Rhona would affect her ability to form trusting relationships in the future.

Third, the department worked with the mother, the father, Rhona and the preadoptive parents to find and evaluate means to alleviate the harm. The judge considered the department's attempts to provide services in anticipation of possible reunification. The department conducted an assessment, drafted individual service plans, renewed visitation, and provided ongo-

ing case management for the family. In addition, the department set up individual therapy for Rhona due to her negative psychological reaction toward renewed visitation. She also received additional medical treatment for her physical symptoms.

Fourth, the means to alleviate the harm were determined to be inadequate. The judge concluded that due to Rhona's special needs as "a medically, neurologically, and psychologically vulnerable child" and the severe psychological trauma of forced removal from her preadoptive parents, Rhona would require medical treatment and therapy to alleviate the harm she would suffer if she were reunited with her parents. The judge found that the mother and father's inability to understand, empathize with, and appropriately respond to Rhona's emotional and psychological needs, combined with their inability to follow professional recommendations and utilize services for themselves or Nancy, created a continuing risk of harm to Rhona. The biological parents have established a pattern which demonstrates that it is likely they would not utilize services necessary to assist Rhona: they would not engage in services themselves nor would they obtain services for Rhona. See, e.g., *Custody of Two Minors*, 396 Mass. at 621 ("The court is permitted to assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child"); *Adoption of Abigail*, 23 Mass. App. Ct. 191, 196 (1986) (past pattern of behavior has prognostic value). Moreover, even with therapy, Rhona would suffer severe long-term emotional and psychological problems.

On these facts, the findings of parental unfitness as well as the inability of the parents to provide for the best interests of the child were fully justified.

6. *Other issues.* The findings of the judge appear to have been adopted nearly verbatim from the proposed findings of the department. We have commented on the need to look at the findings and the evidence with special care when this occurs. See *Adoption of Hank*, 52 Mass. App. Ct. 689, 692-693 (2001) (clearly erroneous standard still applies where trial court adopts party's proposed findings verbatim, but findings are subjected to stricter scrutiny); *Care & Protection of Olga*, 57 Mass. App.

Ct. at 823-824. We have done so and are satisfied that the findings are supported by the evidence and are clear and convincing despite the alarm caused by such a practice. *Adoption of Hank, supra.*

A review of the record shows that the father did not receive ineffective assistance of counsel. The issues that the father raises on this point all seem to involve tactical decisions by his attorney that were not manifestly unreasonable, see *Adoption of Holly*, 432 Mass. 680, 690 (2000), and do not warrant further discussion.

*Decree affirmed.*

*Denial of father's motion for new trial affirmed.*