## ADOPTION OF MELVIN.[1]

No. 07-P-1380.

Hampden. January 11, 2008. - May 12, 2008.

Present: McHUGH, ARMSTRONG, & MEADE, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption. *Minor,* Adoption.

A judge in the Juvenile Court properly issued a decree dispensing with the mother's consent to adoption, where the judge's findings of fact were not clearly erroneous and supported the judge's conclusions of law, and where there was clear and convincing evidence that the child's removal from his caretakers and return to the mother would likely precipitate a severe adverse emotional reaction that the mother did not have the insight and equipment necessary to handle successfully. [712-715]

PETITION filed in the Springfield Division of the Juvenile Court Department on October 4, 2002.

The case was heard by *Patricia M. Dunbar,* J.

*Deborah Sirotkin Butler* for the mother.

*Timothy J. Casey,* Assistant Attorney General, for Department of Social Services.

*Robert E. Young* for the child.

McHUGH, J. After a seven-day trial, a judge of the Juvenile Court wrote a thoughtful and comprehensive opinion concluding that the mother was unfit to parent her child, whom we shall call Melvin, and that her unfitness was highly likely to continue indefinitely. As a result, the judge issued a decree dispensing with the mother's consent to adoption. See G. L. c. 119, § 26; G. L. c. 210, § 3.[2] The mother appeals and we affirm.

---

[1]A pseudonym.

[2]The trial was held in response to the mother's and the Department of Social Services's (department's) request for a review and redetermination hearing. As will be explained, *infra,* an initial trial resulted in the grant of permanent

The facts found by the judge supported the application of eight of the fourteen factors a judge must consider when making judgments about fitness. See G. L. c. 210, § 3(c).[3] As in *Adoption of Rhona*, 63 Mass. App. Ct. 117, 127 (2005), however, it was clear from the findings that factor (vii), dealing with the biological parent's ability to deal with any psychological harm produced by the child's removal from a substitute caretaker, was at the heart of the judge's ultimate conclusion that the mother was unfit. Our narrative, therefore, focuses on the facts underlying that conclusion.

Melvin, who was the mother's fifth child, was born in April, 2001. The mother was almost thirty-one at the time and had been a special needs student who left school in the ninth grade. From the beginning of her schooling, she had struggled academically because of learning disabilities and limited cognitive capacity.[4]

The Department of Social Services (department) became involved with the mother and her children beginning in 1993, eight years before Melvin's birth. That involvement continued after Melvin arrived, for it was evident that the mother had great difficulty caring for all five of her children. Throughout its involvement, the department's concerns focused on neglect resulting from the mother's lack of supervision as well as concerns about the children's cleanliness, absenteeism from school, and chronic lice infestations.

Insofar as Melvin is concerned, the department's first involvement occurred when, at age one, someone found him in a local furniture maker's back room where no one could identify him. This was a few days after a Chicopee police officer found Melvin's five year old sister wandering by herself one-half mile from her home. The day after Melvin was removed from the furniture maker and returned to the mother, he was discovered

custody to the department and an order for a review and redetermination hearing to take place six months later. More than one year after the judge's order, a different judge presided over the proceedings that resulted in the termination of the mother's parental rights.

[3]The eight were (ii), (iv), (vi), (vii), (viii), (ix), (xii), and (xiv).

[4]When Melvin was born, the mother was married to a man other than Melvin's father and had been for some time. Melvin's father was a party to the proceedings in the Juvenile Court and his parental rights were also terminated. He has not appealed.

hanging from an unscreened window in the family's apartment. The discovery prompted the department to remove all the children from the home and to file a petition for their care and protection with the Juvenile Court. On an emergency basis, the children were placed in the department's custody. Three days later, Melvin was placed in what has become his current preadoptive placement. He has lived there ever since.

Two months after the children were removed from the mother's home, the department began to formulate a reunification plan. As a result of the plan, two of Melvin's sisters returned to the mother's care in the spring of 2003, approximately seven months after their removal. Progress was bumpy, however, and the two sisters were again removed from the mother's care three months later.

Over the next year, with the department's help, the mother's parenting skills and her ability to maintain a home suitable for children showed steady, although not unbroken, improvement. Her relationship with Melvin, too, improved but was marked with consistent confusion on Melvin's part about his precise relationship to her. Sometimes, Melvin referred to the mother as "that nice lady" and denied that she was his "mom," saying instead that his preadoptive "mom" was the only "mom" he had. The mother's supervised visits with Melvin sometimes went well but, on other occasions, Melvin told the mother to "get away" or "not to talk" or asked if he could leave. By April, 2005, the department, having concluded that the mother could not meet Melvin's needs, had changed its over-all goal and approach from reunification to adoption by Melvin's foster parents.

After changing the goal, the department had Melvin evaluated by Christina Kline, a psychologist, who ultimately testified at the first trial on the department's care and protection petition.[5] Kline testified that every child has a period during which he or she completes a psychological attachment to an adult. That period typically begins at approximately six months and lasts until the child is six years old. Interruption of the attachment process, in Kline's opinion, can produce serious, ongoing emotional difficulties, and Melvin was at higher than normal risk for

[5]The mother's appellate counsel requested that the judge presiding over the first trial submit written findings. The judge complied and issued findings.

those difficulties because he had been removed from the mother's custody at approximately eighteen months when the attachment process was in full bloom. Kline further opined that removing Melvin from his foster home would interrupt his ongoing attachment process with his foster parents, thus compounding and escalating the risks created by his removal from the mother. For that reason, Kline concluded, the caretaker responsible for Melvin after his removal from the home of his foster parents

> "would need to be extraordinarily skilled in parenting abilities because his needs would no longer be ordinary needs. He would be filled with new insecurities, new anger, and new fears of the world. . . . A new caretaker would need to have extraordinary amounts of patience, extraordinary ability not to personalize rejection . . . [and would have to be] particularly skilled at not taking [Melvin's] attacks, aggression, fears, and withdrawals personally."

That was the state of affairs in May, 2005, when trial on the department's care and protection petition concluded. Upon the trial's conclusion, a judge of the Juvenile Court found that although Melvin was in need of care and protection and although the mother was then unfit to assume parental responsibilities for him, the department had not made sufficient reunification efforts. Accordingly, the judge rejected the department's proposed permanency plan, ordered the department to focus on reunification, and scheduled a review and redetermination hearing for the following November.

In response to the judge's order, the department increased Melvin's visits with the mother and with siblings who, by then, had been returned to her custody. In response, Melvin displayed some negative behavior, including hitting and biting, and was very reluctant to discuss visitation with his foster parents or with the social worker the department had assigned to his case.

As work on visitation progressed, Melvin's opposition to the idea of returning to live with the mother proved to be durable, even though the department engaged a clinician at the Massachusetts Society for the Prevention of Cruelty to Children to work with him exclusively on transition issues. That is not to say that the interactions between Melvin and the mother were

uniformly unpleasant; often they were just the opposite. It is to say, though, that the subject of a permanent transition to the mother's care was for Melvin painful, difficult, and unwelcome. Accordingly, late in the summer of 2005, the department began concurrent planning for adoption and reunification. A component of that planning included increased contacts between Melvin and the mother and increased contact between Melvin and his siblings.

As the fall progressed, Melvin's difficulties with the idea of returning to the mother's permanent care did not abate. Nevertheless, the department persisted, and by February, 2006, Melvin had become more confident about his visits with the mother, although his attitude was perhaps attributable, in part at least, to the "Play Station" game he was able to use during those visits. In any event, the progress was such that at some point in 2006, Melvin asked the mother, "When am I going to live with you?" and talked about having a "sleep over" at her house.

For reasons the record does not reveal, the scheduled November review and redetermination hearing did not take place until June and July of 2006. During the interim, the department's efforts continued. However, by March, 2006, Melvin began to express negative feelings about family visits, at one point going so far as to say that he no longer wanted to have them. He consistently expressed strong desires to return to his foster home when his visits with the mother ended and sometimes asked for the visits to end early. In that regard, social workers observed a visit on June 14, 2006, and saw no affectionate or nurturing interactions between the mother and Melvin, who was focused on a Nintendo game for more than half the time they were together. Indeed, superficial interaction was a continuing feature of the visits between the mother and Melvin.

When the review and redetermination hearing began in June, 2006, the mother was living with three of her five children at an address she had maintained for five years. She was unemployed, as she had been since 1982, and lived on disability and other Federal and State benefits totaling $1,365 monthly. As one might expect from that level of income, the mother had difficulty paying her bills, a circumstance that led to eviction notices and service terminations in the spring of 2006. Although

the department offered to discuss finances with the mother and to help her find possible solutions to her obvious financial difficulties, the mother declined to engage in any such discussions.

The mother's social life was also difficult, and at the time of trial, she was being treated for depression. Despite her depression, and her knowledge that depression was causing problems for her, she had been terminated by her previous therapist for lack of attendance at therapy sessions and was unable to explain why she had stopped attending. Her boyfriend of two years, about whom she knew very little and whose last name she could not spell, was the subject of a restraining order taken out against him by the mother of his daughter. The three children in the mother's custody were struggling academically in school. At one point, one of the children did not bring any homework to school for three weeks and had been "kept back" in grade, although the mother was uncertain as to how many times. Another child had been "kept back" as well. The mother was unwilling to allow the department to help her with those manifest schooling issues.

To her credit, the mother did try to implement some suggestions for dealing with parent-child issues she received from her therapist, who testified at trial that the mother paid attention to her children, had emotional connections with them, and set appropriate limits for them. The problem, according to the same therapist, was the mother's persistent need for assistance in developing structured ways to ensure her children's discipline and care. Although she would implement suggestions when they were made by the therapist, she was consistently unable to come up with solutions on her own.

By the time of trial, Melvin's life outside the mother's home had progressed well. He had a positive relationship with his biological siblings although he did not recognize them as family members. In the preadoptive home Melvin shared with his preadoptive parents and their eleven year old son, Melvin participated in therapy and attended kindergarten, with no identified special education or medical needs. He viewed his foster mother as his only "mother," was close to her, and heavily relied on her for support. While he acknowledged a relationship with the mother, he described his visits with her as "play dates."

As noted, those visits rarely involved more than superficial inter-
action between the mother and Melvin. As recently as a month
before trial, Melvin said that he had no desire to live with the
mother, even though he "loved her," and at each of the five visits
immediately preceding the trial, he asked if he could end the
visits early. In sum, Melvin had clearly and deeply bonded with
his preadoptive parents.

The trial judge further found that Melvin would suffer serious
trauma if removed from his foster home and from his foster
mother primarily for the reasons articulated by Dr. Kline. The
mother had neither the required insight into the nature of that
harm nor the ability to help Melvin deal with its consequences.
For the year prior to trial, the department had provided the
mother with a variety of services, and although she had been
receptive to at least some of them, she had not been able to
utilize them effectively. Indeed, even though the mother had
received departmental services for over ten years, she continued
to struggle with parenting difficulties and with meeting the
daily requirements of household management. Ultimately, the
judge found that the mother was unfit to assume primary re-
sponsibility for Melvin; that her unfitness, to a near certitude,
would continue into the indefinite future; and that Melvin's best
interests would be served by termination of the mother's parental
rights and by implementation of the department's plan for adop-
tion, with specified postadoption contact with the mother and
Melvin's biological siblings.

From our review of the record, we are persuaded that the
judge's findings of fact are not clearly erroneous and that those
findings support her conclusions of law.[6] In that context, it is im-
portant to keep in mind that parents have a fundamental liberty
interest in maintaining custody of their children. See *Care &
Protection of Robert*, 408 Mass. 52, 58 (1990); *Adoption of Ed-*

---

[6]The mother's primary arguments are that many of the judge's findings are
based on hearsay statements about what Melvin said or are otherwise unsup-
ported by any evidence. There was no objection to many of the alleged
hearsay statements, and in any event, they were admissible as evidence of
Melvin's state of mind, a critical issue at the trial. See *Custody of Jennifer*, 25
Mass. App. Ct. 241, 243 (1988); *Custody of Michel*, 28 Mass. App. Ct. 260,
268 (1990). On our view of the record, there was evidence to support the
findings the mother claims are footless.

*mund,* 50 Mass. App. Ct. 526, 529 (2000). Even though the judge does not start with a blank slate in a review and redetermination hearing like this one, see *Care & Protection of Erin,* 443 Mass. 567, 570 (2005), the department must show, by clear and convincing evidence, that the parent remains unfit, that the child remains in need of care and protection, and that his or her best interests are served by removal or termination of parental custody. *Id.* at 572.[7]

At the same time, neither fitness nor lack of fitness comes in a single size. As the trial judge noted, considerations of parental fitness must take into account the parent's character, temperament, conduct, mental stability, and capacity to provide for the particular needs of the child at issue in the proceedings. *Adoption of Mary,* 414 Mass. 705, 711 (1993). For that reason, it is conceivable that parents who are fit and able to provide the requisite care and nurture for one child may be unfit and unable to do so for a different child. *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981). *Adoption of Kimberly,* 414 Mass. 526, 530 n.8 (1993). See generally *Adoption of Ramona,* 61 Mass. App. Ct. 260, 262-264 (2004).

The steps the department takes to protect children at risk may themselves be a source of the differing needs biological siblings possess. Life is dynamic, constantly playing out against a changing backdrop. That dynamism may have a particular impact on the needs of children in the formative stages of development. In particular, the evolutionary bonding process between the very young and their caretakers is a phenomenon the Legislature recognized when it required courts faced with questions about parental fitness and children's best interests to consider whether

---

[7]When a parent adversely affected by a custody determination seeks a review and redetermination hearing, the department's obligation to meet that burden is triggered by the parent's presentation of "some credible evidence that circumstances have changed since the initial determination such that the child may no longer be in need of care and protection." *Care & Protection of Erin, supra.* It is not clear that the same burden of production exists when a judge on her own schedules the hearing. In any event, we assume, without deciding, that the mother met whatever burden of production she may have had and we proceed with that assumption in mind. We note as well that the department would have had the same burden of production since it too sought the hearing. *Ibid.*

"because of the lengthy absence of the parent or the parent's inability to meet the needs of the child, the child has formed a strong, positive bond with his substitute caretaker, the bond has existed for a substantial portion of the child's life, the forced removal of the child from the caretaker would likely cause serious psychological harm to the child and the parent lacks capacity to meet the special needs of the child upon removal."

G. L. c. 210, § 3(c)(vii). See *Adoption of Ramona, supra* at 263.

Here, the evidence showed that Melvin, then one year old, had been removed from the mother's care for reasons no one contests. Three days later, he was placed with caretakers who maintained and nurtured him through the trial that occurred four years later. Melvin had a strong emotional bond with those caretakers and particularly with the woman he viewed as his mother and to whom he turned whenever he needed support or emotional guidance. There was clear and convincing evidence that return to the mother would likely precipitate a severe adverse emotional reaction. Indeed, Melvin, despite his periodic displays of affection for the mother, consistently manifested substantial unease about the thought of living with her permanently.[8] And the mother, despite her periodic efforts to acquire, maintain, strengthen, and utilize the skills necessary for successful parenting, simply did not have the insight and equipment necessary to deal successfully with the psychological trauma Melvin would suffer were the bond between him and his caretakers to be severed involuntarily. See generally *Adoption of Rhona*, 63 Mass. App. Ct. at 127-129.

This case, like many, is difficult not because the proper outcome is unclear but because of the emotional toll the decision is likely to take on those whom the decision adversely affects. The mother, to the extent she is able, has attempted to fit herself with the tools she needs to parent Melvin. Perhaps she could

---

[8]We do not mean to say that a young child's wishes are indicative of the child's best interests, see *Adoption of Erica*, 426 Mass. 55, 63 n.9 (1997); *Care & Protection of Georgette*, 439 Mass. 28, 36 (2003), but in context, they may relate to the understanding of the nature of the bond a child has with his foster parents and the ability of biological parents to meet a child's special needs upon severance of that bond. See generally *Adoption of Rhona*, 63 Mass. App. Ct. at 121-122, 126-129.

have done more. Perhaps not. In any event, her efforts and abilities have fallen short. However much one might wish she had succeeded, the judge was correct in concluding that she was not fit to parent Melvin, given his particular needs and attachments; that the mother's marginal improvement in parenting skills despite her long-time involvement with the department showed that her unfitness was highly likely to continue into the indefinite future; and that termination of her parental rights and proceeding with the department's plan of adoption for Melvin, with the postadoption visitation the judge required, was in Melvin's best interests.

*Decree affirmed.*