NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-252

ADOPTION OF ELISA.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After a trial, a Juvenile Court judge found that the father was unfit to parent Elisa and that Elisa's best interests would be served by the termination of his parental rights. The judge also ordered that the father was entitled to six visits annually with Elisa. The father appeals from the decrees finding him unfit and terminating his parental rights, arguing that the judge gave too little weight to evidence that the father interacted positively with Elisa during regular visits, demonstrated his parenting skills by caring for his older child, and completed many programs and was on a wait list for specialized therapy to treat his borderline personality disorder. The father also contends that the judge improperly considered opinion testimony of a bonding expert that was

_____

[1] A pseudonym.

speculative.  Concluding that the judge did not abuse her

discretion in weighing the evidence and properly considered the

bonding expert's testimony, we affirm.

Background.  We set forth the facts found by the judge

after trial, saving some facts for later discussion.

Between 2007 and 2014, the father was the subject of six

G. L. c. 209A orders issued based on affidavits from four

different women (plaintiffs).[2]  One of those plaintiffs is the

mother of the father's older child, Jared,[3] and one of the 209A

orders, issued in August 2009, was supported by that plaintiff's

affidavit averring that the father had argued with her while she

was holding Jared, and after she put Jared down the father

picked her up by the waist, dropped her, then pinned her in a

corner and yelled in her face calling her names.[4]  Another of the

209A orders issued in September 2010 on the application of

---

[2] Elisa's mother was not one of those plaintiffs.

[3] Also a pseudonym.

[4] Jared was then about two months old.  The record before us
contains reference to a report dated August 2009 pursuant to
G. L. c. 119, § 51A, alleging neglect of Jared by the father
that was supported.  See G. L. c. 119, § 51B.  However, neither
that § 51A report nor the report of the related investigation
under § 51B is in the record.

2

Jared's mother on behalf of Jared, and was in effect for about one month.[5]

In June 2016, the father was charged with assault and battery upon a pregnant person; the alleged victim was Elisa's mother, then pregnant with Elisa. The mother testified that after she told the father she wanted to end their relationship, he grabbed her arms forcefully and shook her; picked her up off the ground and slung her over his shoulder, putting pressure on her belly; tried to force her into his truck; and wrestled her phone out of her hand and threw it away. On October 3, 2016, as part of a plea agreement, that charge was dismissed and the father admitted to sufficient facts for domestic assault and battery, which was continued without a finding for one year on conditions including that he undergo a mental health evaluation.

As a result of an incident on October 10, 2016, just one week after the father entered that plea agreement, the father was again charged with assault and battery upon a pregnant person; this time the alleged victim was his sister. That charge was continued for about ninety days and then dismissed. The father admitted that after his pregnant sister went into a

---

[5] The affidavit in support of that 209A order is not in the record.

3

family member's garage without permission, the father physically assaulted her.

Elisa was born in December 2016, and due to concerns about the parents' history of domestic violence and mental health instability, a report pursuant to G. L. c. 119, § 51A (51A report) was filed with the Department of Children and Families (DCF), which instituted care and protection proceedings. In January 2017, Elisa was placed in the care of her foster parents, who are maternal relatives and became her preadoptive parents. In October 2017, DCF changed its goal for Elisa from reunification with the father and the mother to adoption. The preadoptive parents have adopted Elisa's maternal half-sister and are related to a family that has adopted two other maternal half-siblings of Elisa. The preadoptive parents are committed to adopting Elisa and maintaining her relationships with the father, the mother, and Elisa's half-siblings.

At DCF's request, a psychologist evaluated the father and issued a report in January 2018 recommending that he participate in a domestic violence program. As a result, between August 2018 and May 2019, the father engaged in a forty-week domestic violence program.

At a court hearing in April 2019, the father learned that the mother had agreed to the adoption of Elisa by the

preadoptive parents and was negotiating an open adoption agreement. The mother did not attend the hearing because she was afraid of the father's reaction. The father became very angry and after the hearing went to the mother's workplace, where he waited near her car and confronted her. The father told the mother that the only way she would have a relationship with Elisa was if the father had custody of Elisa, and demanded that the mother apologize to him for "siding with DCF." When the mother tried to drive away, the father put his foot under her car's left front tire. Concerned that because she was on probation she would face consequences if she drove over his foot, the mother started to dial 911, and the father removed his foot. The judge found that the incident illustrated the father's inability to handle someone not behaving in a way that suited him, and his willingness to manipulate people to serve his own needs. Based on the fact that the incident occurred during week thirty-seven of a forty-week domestic violence program, the judge found that the father's "behavior is likely to continue into the future to a near certitude" and "would place [Elisa] at imminent risk of serious abuse and neglect."

In May 2019, psychologist Dr. Jennifer M. Laney evaluated the father and issued a report diagnosing him with borderline personality disorder, which manifests in an "intense fear of

rejection or threat to his primary attachment relationship" that makes him prone, when emotionally dysregulated, "to inappropriate, intense anger" and "transient, stress related paranoid ideation" resulting in "[f]rantic efforts to avoid abandonment."  The judge found that Dr. Laney's diagnosis "precisely describes" the father's pattern of problematic behavior, and "shed[s] light on the apparent ineffectiveness" of the forty-week domestic violence program and individual therapy in which the father had previously engaged.  Dr. Laney recommended that the father undergo dialectical behavior therapy (DBT), an evidence-based treatment for borderline personality disorder that teaches emotional regulation skills using individual, group, and telephone coaching.  DCF requested that the father undergo DBT and supplied him with referrals for DBT providers.

Between July and November 2019, the father sent more than one hundred text messages to the mother, some using terms of endearment and others insulting and belittling her.  The mother initially blocked his messages, then changed her phone number to keep him from contacting her.  Based on the father's testimony, the judge found that the father minimized "the dozens and dozens of text messages he sent to Mother in short periods of time that ranged from friendly to vicious."  The judge found that the

father's unrealistic perception of those attempts at contact was "a manifestation of his mental illness," and did not credit his assessment of the events.

In October 2019 and again in November 2021, the father stipulated that Elisa remained in need of care and protection and that he was then unfit to parent Elisa. Throughout the six years that the case was pending, the father visited Elisa regularly for one- to two-hour supervised visits.

The case was tried over five consecutive days in October 2022, when Elisa was almost six years old. The judge credited the testimony of Dr. Allison Bell, the child's bonding expert, that the father's borderline personality disorder prevents him from prioritizing Elisa's needs over his own. As of trial, the father had not begun DBT treatment for his borderline personality disorder. The judge concluded that the father was unfit to parent Elisa, that his unfitness as a parent was likely to continue, and that termination of his parental rights was in Elisa's best interests.

Discussion. 1. Judge's consideration of the father's strengths. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the

7

parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted).  <u>Adoption of Yalena</u>, 100 Mass. App. Ct. 542, 549 (2021).  The father argues that in finding him currently unfit to parent Elisa, the judge ignored evidence of his strengths as a parent, and as a result the judge's findings were not based on clear and convincing evidence.  See <u>Adoption of a Minor (No. 2)</u>, 367 Mass. 684, 688 (1975) ("Troublesome facts, pointing to a conclusion contrary to that reached by [DCF] or the judge, are to be faced rather than ignored").  The father contends that the judge did not sufficiently weigh the evidence of the father's positive interactions with Elisa during their visits, his acceptable parenting of Jared, and his completion of programs.  We consider each argument in turn.

a.  <u>Father's appropriate behavior during visits</u>.  The father argues that the judge gave insufficient weight to evidence that he regularly visited Elisa and interacted appropriately with her.  The judge did consider evidence that for nearly six years before trial the father engaged in twice-monthly supervised visits with Elisa.  The judge found that the father was "prepared, engaging, thoughtful and kind" with Elisa, and that Elisa "has a caring, loving connection with Father, though she does not identify him as her primary caretaker."

The father argues that the judge should have credited the 2019 report of his bonding expert that during his visits with Elisa the father showed effective parenting skills. Instead, the judge credited the trial testimony of Dr. Bell, who explained that supervised visits in a DCF office or a public place like a park or museum were not necessarily indicative of long-term parenting, because during those visits the father virtually never had to discipline Elisa or engage in her developmental process.

The judge also considered it significant that the father repeatedly refused to allow DCF access to his home to do a home assessment. When one social worker tried to, among other interactions, schedule visits at the home, the father reacted, as the judge found, "with anger, foul language, personal attacks, and sometimes outright rage." The father testified that he would not allow social workers on this case access to his home unless DCF changed its goal for Elisa to reunification.

We discern no abuse of discretion in the judge's weighing the evidence of the father's appropriate behavior during supervised visits. "This decidedly is not a case where the judge failed to confront 'troublesome facts.'" Adoption of Knox, 102 Mass. App. Ct. 84, 94 (2023).

b.  Father's parenting of the older child.  The father argues that the judge gave insufficient weight to evidence that the father's older child, Jared, thirteen years old at the time of trial, had lived with the father for about ten months before trial.[6]  The father contends that because no 51A reports were filed during that time, his parenting of Jared was acceptable, and the judge should have credited his testimony that he was engaged in Jared's medical care and education.

The father told the DCF ongoing social worker that Jared was stable in the father's home, but DCF could not verify that because, as mentioned above, the father refused to allow DCF social workers into his home to do a home assessment.  In addition, the father refused to sign releases so that DCF social workers on this case could access Jared's medical and school records.  Asked at trial if Jared has any special needs or mental health diagnoses, the father said no.  Questioned specifically about whether Jared has attention deficit

---

[6] The judge noted that Jared came to live with the father in a city in Hampden County "apparently because the Worcester division of [DCF] was involved with [Jared], his mother, and stepfather."  The father testified that he and Jared's mother reached a custody agreement in the Probate and Family Court. The record before us contains no documentation from either DCF or the Probate and Family Court about the circumstances of Jared's placement with the father.  In those circumstances, we draw no inference that either DCF or the Probate and Family Court determined that the father was fit to parent Jared.

10

hyperactivity disorder, posttraumatic stress disorder, oppositional defiant disorder, depression, and anxiety, the father admitted that Jared had each of those diagnoses. The father also admitted that under his care Jared was not seeing a therapist; the father testified that clinicians had not returned his calls and Jared was on wait lists. The father testified that Jared had "mood swings" like a "typical[] teenager," and their interactions sometimes escalated to shouting. From the evidence of the father's relationship with Jared, the judge concluded that if Elisa were placed in the father's custody she would experience "denial or forced minimization of her needs, followed by no real intervention, treatment, or support, and as she got older, shouting matches."

We discern no abuse of discretion in the judge's concluding, based on the evidence of the father's parenting of Jared, that the father would not be a fit parent for Elisa. See Adoption of Rhona, 63 Mass. App. Ct. 117, 129 (2005) (judge may "assess prognostic evidence derived from prior patterns of parental neglect or misconduct in determining future fitness and the likelihood of harm to the child" [quotation and citation omitted]).

Moreover, even if the father's parenting of Jared were exemplary -- a conclusion we do not reach based on the

11

incomplete record before us -- a parent may be fit to parent one child but not another.  See Adoption of Flavia, 104 Mass. App. Ct. 40, 42, 52 (2024) (mother's reunification with eleven year old who had lived for five years in residential treatment center did not undermine analysis supporting her unfitness to parent six year old twins who had lived in preadoptive home for two years).  See also Adoption of Cesar, 67 Mass. App. Ct. 708, 712 (2006).  One important difference between Jared and Elisa was that Elisa had been with her preadoptive parents since birth, which would likely mean, as Dr. Bell testified and as discussed below, that Elisa's trauma if separated from them would be particularly acute.

c.  Father's lack of DBT treatment.  The father argues that the judge gave insufficient weight to the programs he had completed, including the forty-week domestic violence program.  We discern no abuse of discretion in the judge's weighing the evidence of the father's programming, including his failure to engage in DBT treatment.

Nearly three and one-half years before trial, Dr. Laney diagnosed the father with borderline personality disorder and recommended that he participate in DBT treatment.  Although the judge credited most of Dr. Laney's report, the judge declined to credit the recommendation that the father could participate in

12

DBT "while he has custody of his daughter, [Elisa]." The judge concluded that Dr. Laney "minimize[d] the physical violence Father has engaged in with at least [five] different women," perhaps because she did not have access to the records of the 209A orders, and "focused more on Father's need for treatment than [Elisa]'s health, safety, and emotional welfare."

The judge found that the father "has dabbled in therapy" but had not yet engaged with a clinician skilled in DBT, and his personality disorder was "virtually untreated." From evidence that the father had been asked to engage in DBT for years but had not yet begun it as of trial, the judge concluded that the father had a "hollow commitment" to treatment and posed an "imminent threat to [Elisa] if she were to be in his care and custody." The judge credited Dr. Bell's testimony that borderline personality disorder is particularly difficult to treat because the illness causes the patient to misinterpret others' actions as attacks or abandonment, leading to "panic-driven" overreactions. The judge also credited Dr. Bell's testimony that, even if the father were to begin "wholeheartedly" engaging in DBT, the effect of treatment "would not begin for a matter of years."

We discern no abuse of discretion in the judge's weighing the father's failure to begin DBT treatment for his borderline

13

personality disorder.  See Adoption of Leonard, 103 Mass. App. Ct. 419, 423 (2023) (no error in finding that mother's untreated mental health issues endangered child).  The judge was not required to credit the father's testimony that his reasons for not having begun DBT were beyond his control, including that DCF had not provided him with referrals; he had contacted multiple agencies and was on wait lists; and that he was "in the process" of doing "pieces" of DBT with his current therapist, who he acknowledged might not be sufficiently qualified in DBT to meet DCF's requirement.  See Adoption of Jacob, 99 Mass. App. Ct. 258, 259, 265-266 (2021) (mother's failure to address mental health issues, including her borderline personality disorder, that impacted her ability to care for child was relevant factor in fitness determination).

2.  <u>Testimony of bonding expert</u>.  Finally, the father argues that the judge abused her discretion in ruling to admit the testimony of Elisa's bonding expert, Dr. Bell, about the risk of harm to Elisa if placed in the father's care.  The father contends that Dr. Bell's opinion was impermissibly speculative and went to the ultimate issue in the case.  We are not persuaded.

Pursuant to G. L. c. 210, § 3 (<u>c</u>) (vii), the judge was required to consider whether Elisa "has formed a strong,

14

positive bond" with her preadoptive parents, which "has existed for a substantial portion of [her] life," whether the forced removal of Elisa from that home would "likely cause serious psychological harm to [Elisa,] and [whether] the [father] lacks the capacity to meet the special needs of [Elisa] upon removal." See Adoption of Rhona, 63 Mass. App. Ct. at 126 (bond between child and preadoptive parents must be assessed in context of harm to child from removal and biological parent's ability to address that harm). See also Adoption of Katharine, 42 Mass. App. Ct. 25, 29-30 & n.9 (1997) (as amended in 1992, § 3 [c] directs judges to give weight to child's psychological bond with substitute caretaker as factor in fitness assessment).

After a voir dire, the judge ruled to permit Dr. Bell to testify as an expert in psychology, specifically bonding, personality and mood disorders and their treatment, and their impact on parenting. When Elisa's counsel asked for Dr. Bell's opinion on the risk of harm to Elisa if she were placed in the custody of the father, the father objected on the ground that the question called for speculation, and the judge overruled the objection. Dr. Bell testified that if Elisa were removed from her preadoptive home she "would in effect become a child with special needs" that would require "an extraordinarily skilled level of parenting" to respond to her emotional distress and

15

angry outbursts. When Dr. Bell testified that in her opinion the father due to his mental health issues did not have the capacity to adequately parent Elisa, the judge sustained the father's objection and struck the testimony on the ground that it went to the ultimate issue. At another point, when counsel for the mother asked if ceasing visits with the father would be more traumatic for Elisa than removal from the preadoptive family, the judge sustained the father's objection, ruling that "the point is dangerously close to a comparative parenting analysis." See Guardianship of Estelle, 70 Mass. App. Ct. 575, 580 (2007) ("we do not transfer a child from his or her parent to other custodians merely because the latter may provide a more advantageous environment for the child's upbringing").

Crediting Dr. Bell's testimony, the judge found that "to remove this healthy, well-adjusted Child from a family setting where all her needs are being met and place her in a setting where her needs may be ignored, or worse yet, met with aggressive opposition, would in fact create a child with a host of social, emotional, and mental health needs that Father is woefully unprepared to meet." We conclude that the judge appropriately applied G. L. c. 210, § 3 (c) (vii), in determining the father's unfitness as a parent to Elisa. See

16

Adoption of Rhona, 63 Mass. App. Ct. at 127-129.

    <u>Conclusion</u>.  We conclude that the judge had before her ample clear and convincing evidence on which to base her finding that the father was unfit to parent Elisa, that his unfitness as a parent was likely to continue, and that termination of his parental rights was in Elisa's best interests.

<u>Decrees affirmed</u>.

By the Court (Rubin,
  Massing & Grant, JJ.[7]),

*Paul Little*

Clerk

Entered:  October 23, 2024.

---

[7] The panelists are listed in order of seniority.