## ADOPTION OF RHONA.[1]

No. 01-P-1472.

Suffolk. March 22, 2002. - February 28, 2003.

Present: DUFFLY, KASS, & TRAINOR, JJ.

*Adoption,* Dispensing with parent's consent, Visitation rights. *Parent and Child,* Dispensing with parent's consent to adoption. *Evidence,* Child custody proceeding. *Due Process of Law,* Child custody proceeding.

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to the adoption of a minor child, the judge's finding that the mother was currently unfit to care for her child, which was based primarily on the subsidiary finding that the mother's drug use had harmed the child and that any further relapse would place the child at risk for further harm, was not supported by clear and convincing evidence, where the most recent incident of the mother's drug use was almost four years prior to the time the findings were made and the decree entered; where there was little evidentiary basis compelling the connection between the mother's drug use and harm to the child; where the judge relied on stale evidence to predict the mother's future behavior, while ignoring more recent evidence of her sobriety; where a lapse of three and one-half years after trial began and two years after the trial ended called into question the accuracy of the judge's findings; and where the judge refused, in determining the mother's current parental fitness as to the child, to consider evidence of her parenting of the child's younger sister. [482-488]

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to the adoption of a minor child, prejudicial error arose from the parents being deprived of all visitation with the child from October, 1998, until June, 2002, in violation of regulations of the Department of Social Services and without a court order allowing the termination of visitation and findings supporting such an order. [488-490]

In a proceeding under G. L. c. 210, § 3, to dispense with parental consent to the adoption of a minor child, the judge, in relying on the bond between the child and her foster parents as a significant basis for determining that it was in the child's best interests to sever all legal relationship with her parents, failed to make findings concerning the nature of the bonds, any trauma that might result in severing those bonds, and the methods to alleviate any trauma that might exist. [490-493]

This court vacated a decree dispensing with parents' consent to the adoption of their child pursuant to G. L. c. 210, § 3, and remanded the case to the

[1]A pseudonym.

Juvenile Court for further proceedings to determine the parents' current fitness and the best interests of the child, and to determine whether visitation should be resumed. [493]


PETITION filed in the Boston Division of the Juvenile Court Department on October 26, 1994.

The case was heard by *Jose Sanchez, J.*

*Shelli C. Hamer* for the mother.

*Henry C. Porter* for the father.

*Sheila L. York,* Assistant Attorney General, for Department of Social Services.

*Lisa M. Sheehan,* for the child, was present but did not argue.

TRAINOR, J. This is an appeal by both the mother and the father from a Boston Juvenile Court judge's grant of a petition of the Department of Social Services (department) to adjudicate their child to be in need of care and protection, pursuant to G. L. c. 119, § 26, and to dispense with their consent to the adoption of their child, pursuant to G. L. c. 210, § 3. The decree issued on June 29, 2000, and findings were entered on September 27, 2000, two years after trial ended on August 13, 1998.

The mother argues that (1) the judge's ultimate finding that she is currently unfit to act as a parent of the child is not supported by clear and convincing evidence; (2) the judge's determination of best interests of the child pursuant to G. L. c. 210, § 3(*c*), was based on findings that were clearly erroneous; and (3) the termination of visitation, delay in the conduct of the trial, and failure to issue the decision and findings in a timely manner were unduly prejudicial and violated the mother's right to due process.

The father argues that the judge committed error in three respects: by improper judicial intervention demonstrating bias; by allowing the department to amend its petition so that the department could proceed to dispense with consent to adoption; and by finding that the department had made reasonable efforts to preserve the family pursuant to G. L. c. 119, § 1.

1. *Procedural history.* On October 26, 1994, the department filed a care and protection petition under G. L. c. 119, § 26, in

the Boston Juvenile Court concerning Rhona, then one month old, and her sister Gail,[2] then twelve years old. Temporary custody of Rhona and Gail was given to the department and both were placed in foster care.[3] The department's motion to amend the pleadings to include dispensing with the parents' consent to adoption of Rhona was allowed on March 26, 1997. The case was heard on the merits on May 7, May 16, June 25-26, August 13-15, September 24, and December 19, 1997; and on February 4, February 11, February 27, April 9, and August 13, 1998.

In November, 1998, after an October visit, the department suspended visits of both parents with Rhona. The father filed a motion for visitation on December 7, 1998. Three days later, on December 10, 1998, the department filed a motion to suspend visitation. Testimony on the termination of visitation motion was heard on June 3, July 1, August 27, and August 30, 1999. The judge did not rule on the issue at that time, but stated that he would address visitation when he addressed the merits of the case. A date of December 10, 1999, was set for the issuance in court of the decision and findings, but was continued several times until June 29, 2000. That day, the judge found Rhona in need of care and protection, awarded custody of her to the department, dispensed with consent to her adoption with respect to both parents, approved the department's adoption plan, and ordered that visits be suspended. The mother's motion for a stay of the decree pending appeal was denied on September 7, 2000. The judge's findings were filed on September 27, 2000. The mother and father appealed.

2. *Facts*. The mother's first daughter, Gail, was born on August 24, 1982, when the mother was fifteen years old. The mother completed high school, attended business education classes, and completed a cosmetology program. She was employed by the Harvard Community Health Plan from 1985 to 1992, when she was laid off. Rhona, the subject of this case, was born on September 21, 1994. The mother's third daughter,

[2]A pseudonym.

[3]Rhona and Gail were first placed with Ms. Brown (a pseudonym), and in July of 1995, Rhona was placed with Ms. Brown's daughter and son-in-law, the Joneses (a pseudonym). The Joneses are currently Rhona's foster parents.

Nancy,[4] was born on January 21, 1996. At the time the judge entered his decree and findings, the mother was living with Gail and Nancy.

Rhona's biological father, who is named in the petition, had no contact or relationship with Rhona until 1996, when Rhona was two years old. At the time the Juvenile Court judge entered his findings, the father was living part time with a son and daughter from other relationships, who are not subjects of this case.

3. *Evidence of current unfitness.* The mother argues that findings made by the judge determining her to be currently unfit are stale and not supported by the evidence. A child may be removed permanently from the custody of her parents and parental consent to adoption may be dispensed with only if there is clear and convincing evidence that the parent is *currently* unfit to care for the child. *Custody of a Minor*, 389 Mass. 755, 766 (1983). *Adoption of Mary*, 414 Mass. 705, 710 (1993). "[T]he 'judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference.' " *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 397 Mass. 659, 670 (1986), quoting from *Custody of Two Minors*, 396 Mass. 610, 618 (1986). A "judge's findings must be left undisturbed absent a showing that they clearly are erroneous." *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). *Adoption of Kimberly*, 414 Mass. 526, 529 (1993). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993), quoting from *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).

In this case, the judge based his ultimate finding of unfitness primarily on the subsidiary finding that "[the mother's] drug use has consistently and repeatedly resulted in harm to [Rhona]. Any future relapse would place [Rhona] at risk for further harm." This finding is the cornerstone of the determination of

---

[4]A pseudonym.

the mother's unfitness, and even if that finding or other subsidiary findings are not clearly erroneous, the findings do not prove parental unfitness by clear and convincing evidence. See *Care & Protection of Elaine*, 54 Mass. App. Ct. 266, 272 (2002).

In any event, that finding is problematic in several respects. First, the most recent incident of the mother's drug use (September of 1996) was almost four years old at the time the findings were made and the decree entered. The judge's findings focus on the mother's drug use during her pregnancy with Rhona in 1994 and the fact that Rhona tested positive for cocaine at birth and experienced withdrawal for six months. The findings further focus on the mother's two relapses, including the September, 1996, relapse that precipitated her entry into the Taking Care of Business (TCB) program. Significantly, and contrary to the judge's determination, all the evidence subsequent to the mother's relapse in September, 1996, was of a positive nature. It spoke to the mother's success in the TCB program and her continued sobriety and success in aftercare. As discussed more fully below, although it was appropriate for the judge to consider the mother's relapses in determining her fitness, it was improper for him to simultaneously ignore the more recent evidence of her sobriety.

Second, there is very little evidentiary basis[5] compelling the connection the findings have drawn between the mother's drug use and harm to Rhona. "Parental unfitness, as developed in the case law, means more than ineptitude, handicap, character flaw, conviction of a crime, unusual life style, or inability to do as good a job as the child's foster parent. Rather, the idea of 'parental unfitness' means 'grievous shortcomings or handicaps' that put the child's welfare 'much at hazard.' " (Footnotes omitted.) *Adoption of Katharine*, 42 Mass. App. Ct. 25, 28 (1997), quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 646 (1975). Drug use, without *more*, falls in this

---

[5]The only evidence of harm to Rhona from the mother's drug use is that resulting from her use of drugs during pregnancy. After the mother relapsed in September, 1996, Rhona was removed to foster care even though there was no evidence that Rhona was harmed as a result of the mother's relapse. See discussion, *infra*. Nancy, the youngest daughter, remained with the mother.

category of being insufficient to support a determination of unfitness. *Adoption of Katharine, supra* at 33-34.

In this case, the judge reached an untenable conclusion that the mother's history of drug use rendered her unfit. In particular, the judge wrongly attributed two incidents in which Rhona was injured to the mother's relapse into drug use. Those incidents show no link between the mother's drug use and harm to Rhona. The first incident occurred when Rhona's father and his family took her to a shopping mall without the mother and without the department's permission. Rhona fell at the mall and received a cut to her head, requiring stitches. No report under G. L. c. 119, § 51A, was filed as a result of that incident, as it was determined to be an accident. There was no evidence, or even a suggestion, that drug use by the mother had anything to do with the injury, which occurred out of her presence. The second incident occurred in August, 1996. Rhona received cigarette burns at a restaurant while in the mother's custody. A § 51A report was filed by the hospital because the burns appeared to be inflicted rather than accidental. The department investigated that § 51A report and determined that the report of abuse was unsupported. The investigator determined that the mother's explanation that the burns happened accidentally at a restaurant was plausible.[6] The hospital was unaware of the mother's explanation at the time of filing the § 51A report. Rhona's pediatrician testified at trial that he believed the burns to be inflicted,[7] but conceded on cross-examination that the mother's explanation could have accounted for the burns.

While evidence regarding an incident that was the subject of an unsupported § 51A report may be used at trial against a parent, *Adoption of Lorna*, 46 Mass. App. Ct. 134, 141 (1999), "[t]he evidence must be sufficient to convey to 'a high degree of probability' that the proposition is true." *Adoption of Iris*, 43 Mass. App. Ct. 95, 105 (1997), quoting from *Tosti* v. *Ayik*, 394 Mass. 482, 493 n.9 (1985), cert. denied, 484 U.S. 964 (1987).

---

[6]The mother explained that she discovered the burns upon leaving the restaurant and believed that Rhona had walked directly into a cigarette being held by a patron.

[7]The pediatrician examined the child four months after the incident and apparently relied on the doctor's report from the emergency room examination.

In the case before us, the evidence presented by the department was not strong and left too much to speculation for the judge to conclude that the mother was the perpetrator or was negligent in her supervision. Without diminishing the gravity of a cigarette burn that had raised medical concern that it may have been inflicted, any connection between the incident and the mother's relapse was conjectural.

Of greater concern, the judge relied on stale evidence to predict the mother's future behavior, while ignoring the more recent evidence of her sobriety. The last evidence of the mother's drug use was in September of 1996, almost four years before the time that the findings were issued and the decree entered. Had the judge entered the findings and decree shortly after the close of trial, in August of 1998, the record we review would have represented a close and difficult case. Specifically, the mother's relapses might legitimately have been considered predictive of her ability to maintain sobriety. "[N]either agencies responsible for the welfare of children nor judges sitting on these sorts of custodial questions need wait for inevitable disaster to happen. They may consider past conduct to predict future ability and performance." *Adoption of Katharine*, 42 Mass. App. Ct. at 32-33 (citations omitted).

Due to the trial's length, and the delay between the end of trial and the entry of the decree, the judge had more than past conduct to predict the mother's future behavior. He had at his disposal evidence not of what the mother's behavior *might be*, but rather what the mother's behavior had *in fact been* since her relapse in September, 1996. The judge received an updated court investigation in December, 1997, and court reports from the department in January, 1998, and August, 1998. All of those reports were admitted in evidence and all testified to the mother's success with maintaining sobriety. By August, 1998, the mother had maintained sobriety for almost two years, and the department was recommending that custody of her eldest daughter be returned to her.[8] In these circumstances, the court

---

[8]The judge had the opportunity to consider the mother's ability to maintain sobriety near the end of the trial when the mother moved to enter a report or, in the alternative, to recall a witness. The judge denied both. The opportunity

was obliged to test its assumption that the mother would again relapse. The passage of four years[9] is too long a period to rely on the predictive value of past behavior without verification — especially when evidence contradicting the prediction is readily available.[10] Contrast *Adoption of Serge*, 52 Mass. App. Ct. 1, 7-8 (2001).

The passage of time is also a basis for calling into question the accuracy of the judge's findings. Evidence was heard during fourteen trial dates spanning a period of time from May, 1997, to August, 1998, and findings were not entered until September, 2000. While "[t]rial judges have great discretion to assess the credibility of witnesses, based on their opportunity to observe the witnesses' demeanor during trial . . . it is all the more crucial we be assured that the judge actually remembers what the witnesses were like." *Care & Protection of Three Minors*, 392 Mass. 704, 705 n.3 (1984). We establish no per se rule or presumption concerning the length of time after which the accuracy of a judge's findings may be called into question. However, a lapse of three and one-half years after trial began and two years after trial ended strains the outer limits of any judge's ability to remember witness demeanor and credibility. In this case, a number of the judge's findings are contradicted by the evidence, suggesting that such limits were exceeded. Compare *Adoption of Don*, 435 Mass. 158, 163-164, 169-170 (2001).

In light of the lengthy delay in concluding the trial and issuing a decision, the better course would have been to reopen

arose again in the summer of 1999, during the hearing on termination of visitation, but the judge limited testimony to the incident that resulted in the termination of visitation.

[9]The period of time between the mother's last recorded incident of drug use and the court's submission of findings of fact and entry of the decree.

[10]The only other finding of future harm to Rhona is based on the allegation that the mother had continued to visit Rhona's father. "[The father] ha[d] perpetrated domestic violence against his wife and [the mother]. They both describe [the father] as abusive. These visits place [the mother] at risk for future drug use and domestic violence, both of which place [Rhona] at risk for abuse and neglect if the court returned her to [the mother's] care." Actually, the court investigator's report states that the father of Gail was abusive to the mother, not Rhona's father. The court investigator reported that [the father] was "good to [the mother] and her daughter." In any event, by June, 2000, this prediction was also verifiable.

evidence to allow all parties to submit relevant, updated information concerning parental fitness. "[I]solated problems in the past or stale information cannot be a basis for a determination of current parental unfitness." *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 18 Mass. App. Ct. 120, 126 (1984).

The judge also refused, in determining the mother's current parental fitness as to Rhona, to take into consideration evidence of her parenting of Rhona's younger sister Nancy. Nancy, born in January of 1996, has lived with her mother since birth. It is undisputed that the mother's care of Nancy has been loving and nurturing and that at no time has the department had any concerns regarding the mother's ability to parent Nancy.

"Parental unfitness 'must be determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age.' " *Adoption of Quentin*, 424 Mass. 882, 886 (1997), quoting from *Adoption of Mary*, 414 Mass. 705, 711 (1993). In some circumstances, a parent may be fit to raise one child and unfit to raise another. *Petition of Catholic Charitable Bureau of the Archdiocese of Boston, Inc., to Dispense with Consent to Adoption*, 395 Mass. 180, 185 n.6 (1985). Such a conclusion, however, requires the judge to conclude that one "child is in need of particular parental skills and stability that the mother was unable to provide." *Id.*

There is no evidence in the record that Rhona has any special needs or requires special parental skills or stability that would dictate the determination that the mother was fit to raise Nancy but not Rhona. The evidence suggests that the girls were similarly bright, verbal, and well-adjusted. In fact, it is *Nancy* who had special needs as a baby, requiring occupational therapy for hypertonicity, and it is undisputed that the mother sought and followed through with services for her. Significantly, Nancy's rapid progress to developmental normalcy was attributed to the mother's consistent follow-through on exercises. Nothing in the record supports the conclusion that the mother

was capable of caring for Nancy and her special needs, but incapable of caring for Rhona, who had none.[11]

Current parental unfitness must be proved by clear and convincing evidence. This standard of proof falls between the burden of proof by a fair preponderance of the evidence and the burden of proof of beyond a reasonable doubt required in a criminal case. However, the required "evidence must be sufficient to convey to 'a high degree of probability' that the proposition is true. . . . The requisite proof must be strong and positive; it must be 'full, clear and decisive.' " *Adoption of Iris*, 43 Mass. App. Ct. at 105, quoting from *Callahan* v. *Westinghouse Bdcst. Co.*, 372 Mass. 582, 584 (1977). Evidence of current unfitness based entirely on a prognosis of future harm must be more substantial in proceedings to dispense with parental consent to adoption than in a care and protection case. See *Adoption of Katharine*, 42 Mass. App. Ct. at 33. If this standard of proof is to have any meaning in a proceeding to dispense with parental consent to adoption, it cannot be said that the evidence and findings in this case add up to clear and convincing proof of current unfitness.

4. *Delay and visitation.* The mother argues that the delay between the start of the trial in May of 1997 (which concluded in August, 1998) and the entry of the findings in September, 2000, violated her right to due process and was unduly prejudicial. Specifically, she contends that a delay of over two years from the end of the trial to the entry of findings not only calls into question the accuracy of the judge's memory in making those findings, but has also specifically contributed to the deterioration of the family relationship because of the reduction and then the cessation of all visitation. In the fall of 1998, the department terminated visitation with both parents based on a single incident that occurred during an October, 1998, visit.

Biological parents are entitled to visitation with their child so long as the visits are not harmful to "the welfare of the child and the public interest." G. L. c. 119, § 35, inserted by St. 1954, c. 646, § 1. Department regulations prohibit the termina-

---

[11]To the extent that Rhona has special needs, those needs related to the mother's ability to address Rhona's bond with her current foster parents. See part 5, *infra*.

tion of visits "unless the matter is brought before a judge, and the judge makes specific findings demonstrating that parental visits will harm the child or the public welfare." 110 Code Mass. Regs. § 7.128 (1998). Terminating parental visits "is a ruling of such significance to the parties that we conclude that the same standards which apply to permanent custody decisions should apply to such a ruling. Thus, before terminating visitation rights, a judge must make specific findings demonstrating that parental visits will harm the child or the public welfare." *Custody of a Minor (No. 2)*, 392 Mass. 719, 726 (1984). The decision to terminate parental visitation must be supported by clear and convincing evidence. *Care & Protection of Ian*, 46 Mass. App. Ct. 615, 620 (1999).

The mother's attendance at visits was regular and without incident. The father had missed some visits because of work. Although both parents had requested an increase in the frequency of visits, visits were not increased. While there was no history of problems occurring during visits, there were chronic problems of scheduling visits attributable to the foster parents and the department.[12]

The October visit was attended by the mother and father, and a number of relatives on both sides, totaling about a dozen

---

[12]Rhona and Gail were placed with Ms. Brown, the mother of the current foster mother (see note 3, *supra*) pursuant to the filing of the care and protection petition in 1994. Within a few months, Ms. Brown requested that the mother not call her house. That became a continuing pattern. When the mother entered the New Day Program (New Day) in May, 1995, for example, the mother's first visit with Rhona did not occur for several months. A visitation schedule was drawn up in July, the first visit to take place on August 24. The visit did not occur because the current foster mother did not make the child available when the social worker went to pick her up. Visits occurred on August 31, September 6, and September 26. Two scheduled visits in October did not take place because the current foster mother did not make the child available. Visits took place on November 3 and 10. A visit scheduled for November 17 did not take place because the current foster mother and Rhona were not home when the social worker went to pick them up. The visit was rescheduled and took place December 1. A visit scheduled for December 8 did not take place because the current foster mother was not home. Of the next four scheduled visits in December and January, only one took place; the other three were canceled, at least one because the current foster mother was not available. In December, 1995, New Day staff asked the department if they could do anything concerning the foster parents' failure to make Rhona available. The department responded that they could do nothing short of changing the placement.

people. The visit was supervised by a department social worker. During that visit, and without speaking to the social worker, a department adoption supervisor entered the visitation room and loudly described the situation as a "circus." There followed a verbal confrontation between the parents, on the one hand, and the adoption supervisor and Ms. Brown, on the other.

This incident was the sole basis for the termination of visitation. When the mother subsequently called the department to schedule another visit, she was told by the social worker that Rhona had been traumatized by the October visit and had been placed in therapy. The mother was told that she would have to go to court to have visits reinstated.

In December, 1998, one month after terminating visitation, the department filed a motion to suspend visitation. After several continuances, a hearing on the motion was held on several dates, beginning in June, 1998, and concluding in August, 1999. The judge made no ruling on the motions on visitation until he ruled from the bench on the merits of the petition on June 29, 2000.[13] The parents were deprived of all visitation from October, 1998, until June, 2000, in violation of department regulations and without a court order allowing the termination of visitation and findings supporting such an order. The parents were prejudiced because the parent-child bond was allowed to continue to deteriorate during a pivotal period in the judicial proceedings. "It is unseemly for the Department to allow the process to drag on, prohibiting contact in the interim, and then argue in support of adoption that bonding has taken place." *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 16 Mass. App. Ct. 607, 612 (1983).

5. *Best interests of the child.* "[T]he 'parental fitness' test and the 'best interests of the child' test are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.' " *Care & Protection of Three Minors*, 392 Mass. at

---

[13]The question of visits was brought up; the judge said that where "visits have already been suspended . . . I'm not going to reconsider that order at this time." It was pointed out that the judge had never ruled on the department's motion to suspend visitation and the parent's motions to reinstate visitation. It was clarified that visits had been suspended pending the judge's decision; he responded: "All right. Then — then visits are suspended per order of the Court."

714, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. at 641. See *Adoption of Carlos*, 413 Mass. 339, 348-349 (1992).

The standard by which a judge is to rule on a petition to dispense with consent is set out in G. L. c. 210, § 3(*c*), which provides in part as follows: "In determining whether the best interests of the child will be served by issuing a decree dispensing with the need of consent as permitted under paragraph (*b*), the court shall consider the ability, capacity, fitness and readiness of the child's parents or other person named in [G. L. c. 210, § 2,] to assume parental responsibility, and shall also consider the plan proposed by the department or other agency initiating the petition."[14]

In making his required findings pursuant to G. L. c. 210, § 3, the judge concluded that four of the thirteen factors to be considered in determining best interest apply to the mother (a number of others also apply to the father), including factors set forth in subsections (ii), (v), (vii), and (xii). We have previously generally discussed the judge's findings and evidence used as a basis for his determinations related to subsections (ii), (vi), and (xii).[15] The judge determined in his findings related to subsection (vii) that disrupting the bond that had been created between Rhona and her current foster parents would result in serious harm to her. The judge also found that the mother would be unable to address the needs of Rhona if that bond were disrupted.

Rhona had been moved four times and had three sets of caretakers during her first four years of life. She had spent most of that time, however, with her current foster parents. She refers to them as "Mommy" and "Daddy." She has thrived while in

---

[14]General Laws c. 210, § 3(*c*), further provides a series of thirteen factors that are to be considered in determining parental fitness for purposes of dispensing with consent to adoption. See, e.g., *Adoption of Hank*, 52 Mass. App. Ct. 689, 691 (2001).

[15]The judge found that Rhona had been neglected by not having a clean environment, adequate food or clothing, or proper supervision while the mother used drugs (subsection [ii]); that, in spite of a lengthy stay in foster care, Rhona could not safely return home (subsection [v]); and that both parents will continue to struggle with drug issues and this will result in neglect and instability to Rhona (subsection [xii]).

their custody and is attached to them. "Although the bonding of a child with foster or adoptive parents is not a dispositive consideration, it is a factor that has weight in the ultimate balance." *Adoption of Nicole*, 40 Mass. App. Ct. 259, 262-263 (1996). The bonding of children with their foster parents cannot be the dispositive factor in these cases because the very fact of placing a child in foster care during judicial proceedings would in every case determine the outcome of those proceedings. It is not unexpected that bonding would occur.

The judge relies on the bond between Rhona and her foster parents as a significant basis for his determination that it is in her best interests to sever all legal relationship with her parents. Obviously, were Rhona to leave her foster parents, she would be leaving a known environment, and one that is important to her. Avoiding the likely "trauma of separation" however, should not be the "determining factor for the judge." *Adoption of Hugo*, 428 Mass. 219, 230 (1998), cert. denied, 526 U.S. 1034 (1999). The bond created between the child and her foster parents will not "automatically trump the rights of biological parents." *Adoption of Katharine*, 42 Mass. App. Ct. at 30. "To the extent that traumatic severance of bonds with a substitute caretaker [becomes] a decisive factor, a judge would be bound in findings to describe the nature of the bonds formed, why serious psychological harm would flow from the severance of those bonds, what means to alleviate that harm had been considered, and why those means were determined to be inadequate." *Id.* at 30-31.

In this case, the judge made no such findings. Notably, the majority of the judge's findings are based upon the testimony of the Joneses and Ms. Brown. There is no expert testimony concerning the nature of the bonds, any trauma which may result in severing those bonds, and no analysis of methods to alleviate the trauma, if any. Moreover, while the judge refers, in his findings, to an updated court investigation, dated December 19, 1997, the investigator, in fact, recommended to the court that a bonding evaluation be conducted of the mother and father, that visits continue during this process, and that the department

continue to support the parents as well as the foster parents.[16] None of those recommendations was implemented.

6. *Conclusion.* On the record and findings before us, there is insufficient support for a decree dispensing with parental consent to adoption. The findings do not reflect either the mother's or the father's current ability to care for Rhona. The staleness of the findings; the prejudicial delay in concluding the proceeding; the prejudicial pattern of visitation, including its inappropriate cessation; and the lack of appropriate evidence to determine what is in Rhona's best interests necessitate our vacating the decree allowing the petition to dispense with consent to adoption as to both parents.[17]

Much time has passed since visitation was terminated and the decree was entered. We are without information about the current circumstances of either parent or of the child. This order, therefore, does not require an *immediate* termination of the child's foster care placement or an *immediate* resumption of visitation between the child and her biological parents. The parent's and the child's current situation should be evaluated before any *immediate* further action is taken. However, the Juvenile Court should expeditiously consider orders relating to resumed visitation, keeping in mind the over-all best interests of the child and any other appropriate methods or assistance supporting an ultimate reunification of the child with her parents.

The decree is vacated, and in accordance with this opinion, the case is remanded to the Juvenile Court for further proceedings to determine the parents' current fitness and the best interests of the child, and to determine whether visitation should be resumed.

*So ordered.*

---

[16]The court investigator also recommended that all parties cooperate with the department and that if the child is returned home a gradual transition should be implemented.

[17]The father argues none of the issues upon which we have based this decision. The arguments he does raise on appeal are without merit. Our concerns in this case, however, apply to him as well as to the mother. Any further proceedings in this matter should include a determination of the father's current unfitness.