NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-141

ADOPTION OF PATTY.[1]


MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a judge of the Juvenile Court terminating her parental rights to her child. She asserts that (1) there was insufficient evidence to support the finding of unfitness, and (2) the Department of Children and Families (department) improperly terminated visits between her and the child, resulting in prejudice to her at trial.[2]  As discussed in more detail below, after a trial the judge found that the mother suffers from alcohol misuse and severe anger management issues.  The child has refused in-person visits with the mother since 2018.  We affirm the judge's decree.

_____

[1] A pseudonym.  We use the same pseudonym as adopted by the Supreme Judicial Court in an earlier appeal in this case, Adoption of Patty, 489 Mass. 630, 648 (2022).

[2] The father's parental rights were also terminated, but he is not a party to this appeal.

Background. The child was born in 2010. The department removed the child from the mother in November 2014 following an incident in the home where the mother was alleged to have punched and bitten her boyfriend while intoxicated, and while the child, then four, was at home. The department filed the underlying care and protection petition and was granted temporary custody of the child. In July 2015, the mother stipulated to her unfitness, and the child was placed in the permanent custody of the department, though the goal was to work toward reunification. In July 2016, the mother filed a motion for review and redetermination pursuant to G. L. c. 119, § 26 (c).

There have been three trials in this matter. The first took place in February 2020. The mother's parental rights were terminated but the termination decrees were vacated, and the case was returned to the trial list. The second trial took place in September 2020. The judge found mother unfit and terminated her parental rights. The mother appealed, and, in May 2022, the Supreme Judicial Court vacated the termination decree and remanded the matter to the juvenile court. See Adoption of Patty, 489 Mass. 630, 648 (2022) (manner in which virtual trial was conducted violated mother's due process rights).

2

After the termination decree from the second trial was vacated, in June 2022, the department reopened the mother's case.[3] In November 2022 the mother filed a pro se motion for therapeutic visitation, stating that she "anticipate[s] therapy and [one hour] a week visitation."[4] The child was then twelve years old. The previous guardian ad litem (GAL) was reappointed to evaluate the issue of visitation. No further action was taken until February 2023, when a hearing on the motion commenced.[5] The motion hearing was eventually consolidated with the third trial, which began in March 2023. At the conclusion of the third trial, the judge found the mother unfit and terminated her parental rights. The following facts are derived from the detailed findings the judge made in support of that determination.

---

[3] The mother met with the department once that month, but was then incarcerated from July 2022 through October 2022. Despite attempts to locate her, the department was unaware until September 2022 that the mother was incarcerated.

[4] At the hearing, when the judge asked what the mother was asking him to do, the mother's counsel stated that she was "asking [the judge] to order the [d]epartment . . .to get this child into therapy" and "locate a family therapist to help determine how best to clinically reengage her in therapy with [the mother]."

[5] The judge noted that the delay between the filing of the motion in November 2022 and the hearing in February 2023 was due to "agreements" amongst the parties, in an attempt, according to her attorney, to resolve the matter short of a hearing.

1. Alcohol abuse and anger issues. The mother has a significant and longstanding history of alcohol misuse. The department has been involved with the family since 2011, when the child was one year old, due to concerns about the mother's alcohol misuse while caring for the child. The mother periodically engaged in substance abuse treatment, and, at the time of trial, resided in a sober home. Her periods of sobriety have been interrupted by relapses in 2014, 2016 (while living at a sober home), 2017, and 2020.

In addition to alcohol misuse, the mother struggles with mental health issues including anxiety, depression, and explosive disorder. She completed several anger management programs and engaged in therapy. Her therapist testified that the mother gets dysregulated easily and can become angry and verbally and physically aggressive when she does not get her desired outcome. This volatility was apparent in the mother's interactions with the department, with her own mother, and in her demeanor at trial.[6] Although the mother denied that she is

---

[6] In November and December 2019, the mother left three voicemail messages for the social worker, calling her a "cunt" in each one and telling the social worker to "watch her back" and that the mother knew where social worker lived. In December 2022, during a meeting with the social worker, the mother stated, "I don't know how this will end, maybe I will throw a bomb, or kidnap [the child]."

an angry person, she acknowledged that she struggles to control her emotions.

The mother's alcohol abuse and volatility have contributed to her lengthy criminal history. Between 2015 and 2020, the mother was convicted of a number of charges including assault and battery (multiple counts), threatening to commit a crime, violation of a restraining order, and operating under the influence of liquor, second offense. She was incarcerated for six months in 2018 on the conviction for violating a restraining order, and received either probation, a suspended sentence, or a split sentence for the other convictions. She was incarcerated at least twice during the pendency of the petition as a result of violating the conditions of her probation.

Between 1998 and 2020, the mother was the defendant on four harassment prevention orders and fourteen abuse prevention orders. The 2020 harassment prevention orders stemmed from the mother's attempts to locate the child in foster care. In 2019, she googled the child's name and found a record associated with a certain church. The mother went to the Christmas Eve service at that church and thought she saw the child getting into a car. The mother then followed the car to a nearby home, knocked on the door, and asked the teenager who answered if Patty was there. When the teenager told the mother that the child had just left, the mother wrote a note stating, "[Patty] is not

5

yours," and left the note under the door mat.  A resident of the home obtained a harassment prevention order against the mother.

2. <u>Visitation history</u>.  The mother has not had visitation with the child since October 2018. Prior to that, from 2014, when the child was removed, to October 2018, the mother and the child had fairly regular visitation.  These visits took place at the department's area office, in the community, or at jail if the mother was incarcerated.  By all accounts, the visits generally went well.

However, during a visit in February 2018 while the mother was incarcerated, the mother asked the child, then seven years old, whether she had ever sent the child to school dirty, whether she was ever mean to the child, and whether the child had ever seen her smoking cigarettes.  The mother was emotional throughout the visit, and, following this visit, the mother did not want the child to visit her at jail.  Visits resumed upon the mother's release from jail and occurred monthly between April and July 2018, at which the mother behaved appropriately, but by the end of August 2018, the mother was again incarcerated.

In October 2018, the mother had moved from jail to a transition program.  During a visit at that program, the mother asked the child (who was then eight years old, and had been

6

moved to a preadoptive home two months earlier) whether the child liked her foster mother more than the mother and stated that she needed to know about where the child was living. Later in the visit, the child drew a picture and offered it to the mother. The mother refused to take the picture, telling the child to take it home to her "real mother." The social worker attempted to redirect the mother, without success, and therefore decided to end the visit as Patty was "hysterical." As the child was making her way to the building exit with the social worker, the mother picked the child up and brought her back to the visitation room. The child asked to be put down but the mother did not do so until she was prompted by the social worker. The child later told the social worker that she was afraid to see her mother because she was afraid her mother would pick her up and squeeze her again and that it hurt.

Following the mother's release from incarceration at the end of December 2018, the department scheduled three visits the following month, but the child refused to go.[7] On January 24, 2019, the mother had a supervised phone call with the child. The call ended with the child crying hysterically in response to a comment made by the mother. In February 2019, the mother

---

[7] The mother had been sent back to jail following the visit after an altercation with a correction officer at the transition program.

filed a motion seeking to compel visitation.  The court appointed a GAL to evaluate the issue of visitation and the child's refusal to attend visits, but the mother later withdrew her motion to compel visitation.

Between March and August 2019, the mother was not responsive to the department's attempts to contact her.  When the mother contacted the department in August 2019, she requested visits with the child.  The social worker told the mother that the child did not want to visit with the mother. The mother responded that she did not care what the child thought.

From the last in-person visit in October 2018, through the end of the second trial in 2020, the department continued to schedule visits between the child and the mother and worked to make the child more comfortable with visits.  The social worker would speak to the child the day before the scheduled visit to see if the child wanted to attend, and would speak with her again on the day of the visit to see if the child had changed her mind.  The child never changed her mind and continued to refuse visits and calls with the mother.  The child has expressed fear that the mother would try to take her from a visit or try to kidnap her.  The department asked the child's therapists to address her relationship with the mother and her fears about having contact with the mother, and offered to have

8

a police officer present at the visits, but the child continued to refuse visits.

Discussion. On appeal, the mother contends that (1) the evidence was insufficient to support the judge's determination that she was unfit, and (2) the department improperly terminated her visitation with the child, which prejudiced her at trial. We address each contention in turn.

1. Unfitness. A judge's decision to terminate parental rights must be supported by "clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of the evidence, that the parent is unfit to care for the child and that termination is in the child's best interests." Adoption of Arianne, 104 Mass. App. Ct. 716, 720 (2024), quoting Adoption of Xarissa, 99 Mass. App. Ct. 610, 615 (2021). "We give substantial deference to the judge's decision to terminate parental rights 'and reverse only where the findings of fact are clearly erroneous or where there is clear error of law or abuse of discretion.'" Adoption of Arianne, supra, quoting Adoption of Valentina, 97 Mass. App. Ct. 130, 137 (2020).

The mother claims error in the judge's finding of unfitness, asserting that the judge relied on stale evidence where, prior to trial, the mother had over two years of sobriety and was actively addressing her anger issues. The mother also

argues that no nexus was shown between her anger issues and her ability to parent the child.

We are not persuaded. The record amply supports the judge's findings, and we discern no abuse of discretion or error of law in the judge's ultimate conclusion that the mother was unfit, and that termination of her parental rights was in the child's best interest. Although at the time of trial the mother had been sober for over two years, she had a significant history of alcohol abuse. She had also stopped taking vivitrol, a medication which blocks the effects of opioids and alcohol, approximately five months before trial. The judge properly considered the mother's current sobriety in light of her long-standing history of alcohol abuse, her multiple relapses after long periods of sobriety, as well as her cessation of medication-assisted treatment.

Moreover, the judge acknowledged the mother's engagement in anger management and therapy but found that it was outweighed by the mother's lack of insight into how her behavior harmed the child and led to the child's removal, as well as the judge's own observation of the mother during trial.[8] Among other things, the judge found that the mother (1) was unable to control her

_____

[8] The mother had also stopped taking her prescribed medications, including medication for anxiety and a mood stabilizer, out of spite towards the department.

10

behavior throughout the trial; (2) believed that the petition was "bogus" (as written in her November 2022 motion); and (3) showed complete disregard for the child's stated desire not to have any contact with the mother. The judge expressed "grave concerns" about the mother's efforts to locate the child while in foster care (which included following a family home from church on Christmas Eve and returning to that home on multiple occasions thereafter), noting the mother's inability to recognize the severity of her actions and their impact on the child. The judge further found that the mother had demonstrated an inability to (1) maintain stable and continuous housing; (2) maintain consistent contact with the department; and (3) meaningfully benefit from, or improve her parenting skills by participating in anger management and therapy. There was no error.

The mother also challenges a number of the judge's subsidiary findings and conclusions of law as clearly erroneous. We are, again, unpersuaded, as there is ample record support for the challenged findings and conclusions, the majority of which are based on testimony presented during the trial.[9] We see

---

[9] For example, the judge found that the mother threatened to kidnap the child. The judge was not required to credit the mother's contention that she was merely venting when she made the statement. The mother testified that she had said "stuff like that out of anger in the past." However, there was evidence presented that the mother went to great lengths to locate the

11

nothing in the record that warrants disturbing the judge's weighing of the evidence or her credibility determinations.[10] See Adoption of Quentin, 424 Mass. 882, 886 n.3 (1997).

2. Visitation. The mother contends that the department improperly "terminated" her visits with the child in violation of its own regulations, and that she was prejudiced at trial by the lack of visitation for over four years. Again, we are not persuaded.

There is no question that if the department seeks to "terminate" visitation, the matter must be brought before a judge and the judge must make a specific finding that parental visitation will harm the child or the public welfare before visits may be terminated. See 110 Code Mass. Regs. § 7.128 (2011). Here, however, it cannot be said that the department's actions equated to terminating, or seeking to terminate, visits. To the contrary, the department's actions contradicted "termination"; the department continued to schedule visits and to check in with the child, it encouraged the child's therapists

_____

child's foster home and admitted, proudly, to knowing where the child currently resides and having seen her several times in a particular town.

[10] We acknowledge the accuracy of mother's challenge to finding 168, regarding the date the child's engagement in therapy ended. However, any error in that finding is harmless as the mother's reasoning for filing her motion for therapeutic visitation was not relevant to the determination of her unfitness.

to work with the child on her willingness to visit her mother, and attempted to address the child's safety concerns by offering to have a police officer present at the visits.  Indeed, at the hearing on the mother's motion, counsel for the department confirmed that if the child requested a visit, the department would make it happen.

The department's actions in this case contrast sharply with the cases which have addressed actual "termination" of visitation.  In those cases, it was abundantly clear that the department did in fact terminate visits.  See Adoption of Franklin, 99 Mass. App. Ct. 787, 796 n.14 (2021) (department conceded that unilateral decision not to schedule any more visits was nothing other than termination of visits); Adoption of Linus, 73 Mass. App. Ct. 815, 817 & n.4, 822 (2009) (department suspended visitation, primarily due to parents bringing unsuitable snacks); Adoption of Rhona, 57 Mass. App. Ct. 479, 489-490 (2003) (visits terminated after department supervisor declared one visit "a circus," and told mother she would have to go to court to reinstate visits).

Moreover, even if the department's actions could somehow be equated to termination, reversal would not be necessary as the mother has not demonstrated that she was prejudiced by the lack of visits.  It is clear from the record that the absence of visitation played a minimal role in the termination of the

13

mother's parental rights.  See Adoption of Franklin, 99 Mass. App. Ct. at 799 (fact that father had seen children once in over two years played limited role in judge's finding of unfitness or decision to terminate father's parental rights).  Rather, the judge emphasized that the mother's "mental health issues and uncontrolled anger and emotions," the severity of which was demonstrated by her behavior throughout the pendency of the

petition and in the courtroom, "impair her ability to parent her child and to look out for the best interest of her child."

Decree affirmed.

By the Court (Englander,
  Hershfang & Brennan, JJ.[11]),

_Paul Little_

Clerk

Entered:  March 12, 2025.

---

[11] The panelists are listed in order of seniority.