NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-554

ADOPTION OF HILDA (and a companion case).[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals[2] from decrees issued by a judge of the Juvenile Court finding her unfit and terminating her parental rights to two of her children, Hilda and John.[3]  She contends that the judge erred by ordering a suspension of visits with the children and by finding the mother unfit and terminating her parental rights.  We affirm.

Background.  Hilda and John are twins who were born in January 2017.  Four days after their birth, a mandated reporter

---

[1] Adoption of John.  The children's names are pseudonyms.

[2] No putative father ever appeared in court.

[3] The mother has five children but has custody of only her youngest child due to an extensive history of substance misuse, police intervention, and domestic violence.  None of the other children are subjects of this petition.  References hereafter to "the children" are to Hilda and John.

filed a report pursuant to G. L. c. 119, § 51A (51A report), alleging parental neglect based on the removal of the mother's two older children and the mother's positive toxicology screen for oxycodone in December 2016.  An investigation conducted pursuant to G. L. c. 119, § 51B (51B investigation), supported the allegations of neglect, and the department opened a case on the family but did not remove the children from the mother's care.

On October 17, 2017, a reporter filed 51A report alleging that the mother was using intravenous heroin while the children were in the home, that the mother needed medical attention, and that the children needed clothing.  A subsequent 51B investigation supported the allegations.  When department social workers arrived at the home, they observed months-old scars on the mother's arms consistent with heroin use, which contradicted the mother's claim that she had been sober since 2012.  The department did not remove the children.

On August 2, 2018, the mother, with both children in the car, slammed head-on into a school bus.  The mother suffered a broken wrist, tibia, and fibula.  At the hospital, the mother appeared intoxicated, and emergency medical services reported that the mother received up to twelve doses of Narcan.  Emergency room staff saw a crack pipe fall out of the mother's clothes.  John had visible lines from the seatbelt straps, a

2

bruise on his thigh, and a bump on his head. He was admitted to the hospital for further observation. The department took temporary custody of the children and filed the instant care and protection petition on August 3, 2018. The department placed the children with the foster parents, where they have remained since the removal.

The department's subsequent investigation supported the allegation that the mother was under the influence during the crash. The mother admitted to an emergency medical technician that she had used three bags of heroin before the crash but later denied using drugs, stating that she had not used heroin in days and blamed the accident on lack of sleep. She also denied receiving Narcan, owning the crack pipe, having suicidal ideations, or having recent track marks on her arms. The judge did not credit these denials. The mother could not recall where she was going that day or why the twins were not in daycare at the time of the crash. The mother was admitted to the hospital's inpatient psychiatric unit under an order pursuant to G. L. c. 123, § 12 (a).

After the psychiatric hold at the hospital, the mother was committed to a substance abuse treatment facility pursuant to G. L. c. 123, § 35. She was discharged on September 26, 2018, approximately fifty-five days after admission. The mother engaged in substance abuse treatment beginning in November 2018

3

before relapsing in May 2019. Although the mother claimed that she has remained sober since May 2019, she tested positive for fentanyl in June of 2021 and alcohol in August of 2021. The mother had little engagement with substance abuse treatment providers between December 2019 and May 2021. Between May and September 2021, the mother completed fourteen sessions at the Addiction Recovery Institute, where she was diagnosed with opioid use disorder, unspecified alcohol-related disorder, and posttraumatic stress disorder. She failed to complete a court-ordered hair follicle drug screen in 2022.

Between 2021 and 2022, the mother had several interactions with police. In February 2021, a police officer observed the mother "actively slamming [her roommate's friend's] head against the floor." In March 2021, a police officer observed the mother assault a friend's daughter by grabbing her hair. In April 2021, the mother called the police when she was locked out of her house, and she appeared intoxicated while interacting with the responding officers. In May 2022, police responded to the mother's home for a report of an assault. At the scene, the mother yelled and swore at the officers, who determined that the mother was too intoxicated to provide a witness statement.

Throughout the termination proceedings, the mother maintained that she did not have a problem with alcohol use -- a claim the judge discredited due to multiple instances in 2021

4

and 2022 where police officers observed the mother to appear intoxicated.

In late 2018, the mother began visitation with the twins during her involuntary civil commitment for her substance use disorder pursuant to G. L. c. 123, § 35.  The mother initially did well during her visits, but in 2019, the children started exhibiting increasingly negative behaviors immediately before and after visits.  John exhibited night terrors while asleep and violent behaviors while awake, such as spitting, hair pulling, and hitting.  He also experienced eczema flare-ups around the times of visits.  Hilda "shut down" after visits and requested not to see the mother.

In 2020, the visits transitioned to video calls due to the COVID-19 pandemic.  Between March and May 2020, the mother's attentiveness during the virtual visits waned.  During the summer of 2020, the virtual visits lasted no more than thirty minutes, sometimes stopping due to John's aggressive behaviors. Attempting to address the children's increasing behavioral issues before and after the visits, the department created an emergency action plan outlining expectations for the mother. However, the children's behavioral issues continued to increase, and the department suspended visits for six weeks beginning in July 2020, partly based on the recommendation of the twins' pediatrician.

5

The suspension of visits continued to October 2020. During this period, the twins' negative behavioral and physical symptoms subsided. On September 15, 2020, the mother moved to enjoin the department from continuing the suspension. The judge granted this motion on October 26, 2020, explaining that "the department has [neither] developed a plan to resume visitation nor brought the matter before the Court to ask the Court to make 'specific findings demonstrating that parental visits will harm the child(ren)' pursuant to 110 CMR 7.128."

When the visits resumed, so did the twins' negative behaviors and physical symptoms. In November 2020, the pediatrician reported that Hilda had become "very clingy and anxious," refusing to sleep in her bed because she was "afraid that they will take her." Hilda also began experiencing eczema episodes.

On February 1, 2021, the children filed an emergency motion to suspend parent-child visitation for an indefinite period. The judge granted this motion on a temporary basis and subsequently held an evidentiary hearing on the children's motion. On May 11, 2021, the judge granted the children's motion, finding by clear and convincing evidence that the visits were harmful to the children and were causing their negative behaviors and physical symptoms. The judge found that the mother insisted that the twins call her "Mommy" during visits

6

against their wishes and did not understand the children's "developmental or emotional needs."  The judge recognized that her written decision was "timely, but brief" and acknowledged her "obligation to make specific findings demonstrating parental visits will harm the child[ren]."  The judge reserved "the right to make further specific findings of fact should the parties file an appeal."

Following four nonconsecutive days of trial in June and August of 2022, the judge found the mother unfit and terminated her parental rights.  She issued comprehensive findings of fact and conclusions of law, which are supported by the record.

Discussion.  1.  Suspension of visits.  The mother contends that the judge erred in ordering a temporary suspension of visits pending a hearing on the same issue because the order was unsupported by the evidence and violated the mother's due process rights.  We are not persuaded.

"Biological parents are entitled to visitation with their child so long as the visits are not harmful to 'the welfare of the child and the public interest.'"  Adoption of Rhona, 57 Mass. App. Ct. 479, 488 (2003), quoting G. L. c. 119, § 35.  Generally, "the visitation right is . . . subject to adjustment for temporary, unusual, or extraordinary circumstances, in the reasonable discretion of the department."  Thaddeus v. Secretary of the Executive Office of Health & Human Servs., 101 Mass. App.

Ct. 413, 422 (2022). For example, "[t]he department can . . . restrict the duration or frequency of the parent-child visits if the visits have a negative impact on the child." Id., citing Adoption of Darlene, 99 Mass. App. Ct. 696, 701 (2021). Here, the judge had the authority to determine whether visits with the mother were harmful to the children. "Department regulations prohibit the termination of visits 'unless the matter is brought before a judge, and the judge makes specific findings demonstrating that parental visits will harm the child or the public welfare.'" Adoption of Rhona, supra at 488-489, quoting 110 Code Mass. Regs. § 7.128 (1998). We review the judge's order to temporarily suspend visits for abuse of discretion. See Thaddeus, supra at 423 n.12.

On February 2, 2021, the judge held an emergency hearing on the children's motion to suspend visits. The judge considered affidavits from attorneys for the children and the department, a letter from the children's pediatrician, and a clinical support options safety plan for the children. The evidence detailed the physical, emotional, and mental impacts of continued visitation following the judge's order to resume visits on October 26, 2020. The children experienced trouble sleeping and "visibly large eczema skin flare-ups" immediately before and after visits. John had tantrums during and after visits, including throwing chairs across the room, shutting the pantry door on his

8

leg, biting the foster mother, stabbing at objects, and intentionally hitting his head on the floor. John also regressed in his learning. Hilda became dysregulated after visits, and both children expressed their desire not to visit with the mother. At the conclusion of the emergency hearing, the judge expressed concern about the children and ordered the suspension of visits.

The evidence supports the judge's decision to temporarily suspend visits. Both children exhibited significant negative physical, emotional, and mental effects from continued visits with the mother. Adoption of Rhona, 57 Mass. App. Ct. at 488. Furthermore, the record demonstrates that the judge took a thoughtful approach to her decisions about visitation throughout the pendency of the case. Notably, she granted the mother's September 2020 motion to enjoin the department's initial suspension of visitation, allowing the mother and the children a second chance at visitation before a more significant suspension. We discern no error in the judge's decision to temporarily suspend the visits.

The mother contends that the temporary suspension nonetheless violated her right to due process.[4] We are not

---

[4] The mother also contends that certain comments made by the judge at the conclusion of the full evidentiary hearing on the visitation issue further support her due process claim. Such

persuaded. "Due process is satisfied by providing notice and an opportunity to be heard." Adoption of Talik, 92 Mass. App. Ct. 367, 375 n.9 (2017). The mother received notice of the department's intent to suspend visitation in July 2020. The mother successfully enjoined this suspension once it had exceeded its stated six-week duration. In February 2021, the children moved for another suspension of visits. The mother was represented at an emergency hearing on this motion the following day and at the subsequent evidentiary hearing. We conclude that the mother's due process rights were not violated where she had opportunities to be heard at multiple proceedings, including a successful motion to enjoin the department's initial suspension of visits.[5]

2. Unfitness and best interests of the children. The mother contends that the judge erred in finding her unfit and terminating her parental rights because the judge improperly

---

comments are not relevant to our inquiry because "[w]e look to the judge's thorough written decisions, made after consideration of the arguments at the hearings and the parties' papers, rather than to the 'thinking out loud' type of comments . . . made while grappling with the scope of the relevant law and seeking comment from counsel in considering different analyses." Commonwealth v. Spencer, 465 Mass. 32, 45 (2013).

[5] We note that the mother never filed a motion to reconsider, a motion to reinstate visits, a motion for abuse of discretion, or an interlocutory appeal of the judge's decision.

relied on the limited bond between her and the twins caused by the suspension of visits. We disagree.

"In deciding whether to terminate a parent's rights, a judge must determine whether there is clear and convincing evidence that the parent is unfit and, if the parent is unfit, whether the child's best interests will be served by terminating the legal relation between parent and child." Adoption of Ilona, 459 Mass. 53, 59 (2011). Subsidiary findings must be proven by a fair preponderance of evidence. Adoption of Quentin, 424 Mass. 882, 886 (1997).

The mother argues that the judge erred in finding her unfit because the department engaged in the "unseemly" practice of suspending visitation "and then trying to leverage the subsequent deterioration in the parent-child relationship in judicial proceedings." Adoption of Franklin, 99 Mass. App. Ct. 787, 796 (2021). This argument fails because the judge did not consider the mother's lack of visits with the children in the year preceding the trial. The judge evaluated the provisions of G. L. c. 210, § 3 (c), and found factors (ii), (iii), (iv), (vi), (vii), (viii), (x), and (xii) to be applicable. Factors the judge considered include the mother's serious motor vehicle crash while driving impaired with the children, the mother's inability to appreciate the dangers of her continued use of alcohol and opiates, the mother's extensive history of physical

11

altercations and police contact, and the specialized needs of the twins related to their emotional dysregulation.  These factors, along with the other factors described by the judge in her findings of fact, support the judge's finding of the mother's unfitness by clear and convincing evidence.  Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008) (evidence of alcohol or drug abuse relevant to "parent's willingness, competence, and availability to provide care").  See Adoption of Chad, 94 Mass. App. Ct. 828, 838 (2019), quoting Adoption of Zoltan, 71 Mass. App. Ct. 185, 188 (2008) ("[T]he issue [of unfitness] is not 'whether the parent is a good one, let alone an ideal one; rather, the inquiry is whether the parent is so bad as to place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child'").

The judge's finding that terminating the mother's parental rights was in the children's best interests was supported by clear and convincing evidence.  "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. at 59.  Since August 2018, the children have resided in their current placement with the preadoptive parents.  The preadoptive parents are currently meeting the children's needs.

12

The judge found that while both children have individualized education plans, "they are otherwise developmentally on target." The importance of establishing permanency for the children, who have resided with the same preadoptive parents since their removal from the mother, supports the judge's finding that termination of the mother's rights is in the children's best interests. "The Supreme Judicial Court has emphasized the importance of achieving stability and permanency in children's lives and in decrees dispensing with parental rights." Adoption of Thea, 78 Mass. App. Ct. 818, 824 (2011), citing Adoption of Nancy, 443 Mass. 512, 517 (2005). Accordingly, we conclude that the judge did not abuse her discretion in terminating the mother's parental rights. See Adoption of Ilona, supra.

We discern no error in the judge's unfitness determination and her decision to terminate the mother's parental rights, where the mother did not challenge any of the judge's factual

13

findings, and the judge did not rely on the lack of visitation between the mother and the children.

Decrees affirmed.

By the Court (Rubin, Neyman & Tan, JJ.[6]),

Clerk

Entered: June 3, 2025.

---

[6] The panelists are listed in order of seniority.