NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-137

ADOPTION OF WHITLEY (and a companion case[1]).


MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from decrees issued by a judge of the Juvenile Court terminating his parental rights to his daughter, Whitley, and son, Allen, pursuant to G. L. c. 119, § 26, and G. L. c. 210, § 3.[2]  The father asserts that several of the judge's findings were clearly erroneous, that there was no nexus between his mental health and his ability to parent the children, that he substantially complied with his action plan, and that the judge's finding of unfitness was based on stale information.  The father clearly loves his children.  He has

---

[1] Adoption of Allen.  The children's names are pseudonyms.

[2] The judge also terminated the mother's parental rights. The mother has not appealed.  The Department of Children and Families has been unable to locate the mother since 2019, and she has not contacted the department or attempted to contact the children since that time.

made substantial progress, particularly as shown by his maintaining employment at the Salvation Army. Nonetheless, because the judge's conclusions that the father remained unfit at the time of trial, and that his unfitness would continue indefinitely into the future, are supported by clear and convincing evidence, and the determination that termination of parental rights is in the best interests of the children is neither an abuse of discretion nor a clear error of law, we affirm.

Facts. The Juvenile Court judge found the following facts.

1. The department's initial involvement. The father and the mother had two children, Whitley and Allen. Although the family first came to the attention of the Department of Children and Families (department) in 2013, the events that led to this care and protection proceeding began in February, 2017.

On February 11, 2017, the department received three reports pursuant to G. L. c. 119, § 51A (§ 51A report), about the family. All three § 51A reports alleged that the father had thrown an object at the mother during a domestic dispute; one report claimed this object was a doorknob and one claimed it was a toolbox. The department investigated these allegations and determined that they were supported. The department opened a case for services for the family. At the time, the department

2

found that the children were safe in the mother's care but that the father should not be in a primary caretaking role.

Later, in May, 2017, the department received and investigated two more § 51A reports regarding the family. At the time, the mother was ten weeks pregnant. The department investigated these reports and learned that, on the day of the incident alleged, the mother dropped the children off with the maternal grandfather while she went to help a friend return a rental car to Maine. The father appeared at maternal grandfather's house, "reportedly drunk or high," and said he planned to go to his sister's house and keep the children. The mother and her friend came to retrieve the children, but when she tried to leave with them, the father tried to block the door and pushed her. The mother's friend reported that the father kicked him in the face and kicked his car. The mother was eventually able to leave with the children and her friend. As a result of this incident, the father was arrested for assault and battery on a pregnant person and incarcerated for ninety days.

In August, 2017, the father began living with the mother and the children again. The mother eventually asked the father to leave on New Year's Eve of that year.

The department received another § 51A report on January 12, 2018, alleging that the father had texted the reporter that the

3

mother was "falling off her wagon" and had sent the reporter a photograph depicting the mother sleeping or unconscious in bed with a plate containing three needles beside her. In the photo, one of the children was in the bed with the mother, and the other was in the same room.

After moving out of the mother's home, the father spoke to the department's response worker and disclosed that he had been concerned for the past several months that the mother was using drugs. He shared a video recording with the response worker that showed the mother screaming obscenities, accusing the father of taking her "dope," and insisting that she had three bags of heroin. In this video, Whitley could be seen walking across the room during the parents' argument. Another video, taken nine minutes before the first, showed Allen sitting in an empty bathtub. The father explained that the mother was supposed to give Allen a bath but forgot about him. The father could not explain to the response worker why he had not reported his concerns about the mother until after she required him to leave the house.

Due to concerns that the mother was using drugs while the children were in her care and that the father hid this fact and allowed her drug use to take place in the children's presence, the department filed a care and protection petition on January

4

23, 2018.  That same day, the department obtained temporary custody of the children.

    2.  <u>The father's mental health, housing, substance use, and action plan</u>.  The father has struggled with his mental health throughout the department's involvement with the family.  On multiple occasions, the father has been hospitalized due to his mental health.  The father has been diagnosed with thought disorder, bipolar disorder with psychotic features, schizoaffective disorder, substance abuse, and opioid disorder, with a question of schizophrenia.  The father's symptoms have included tangential speech, paranoia, and hallucinations.  From October, 2018, to August, 2019, the father took prescribed anxiety medication.  During this time, his presentation improved; he presented with a clear and coherent thought process and did not experience paranoid thoughts.  In August, 2019, however, the father began denying that he had any mental health conditions and refused to follow his providers' recommendations about psychiatric medication, including medication for his bipolar disorder and antipsychotic medication.  Since then, his presentation declined; around providers, department staff and members of the public, he presented with tangential speech, racing thoughts, an inability to focus, and symptoms of psychotic process, such as paranoia and visual hallucinations.

The Juvenile Court judge noted that some of the father's testimony at trial seemed tangential and nonresponsive, consistent with what his providers and department staff had reported about his presentation.

The father has also experienced housing instability throughout the pendency of this case. He has been homeless since the mother stopped allowing him to live at her home. He initially stayed at both the Shattuck Shelter and the Pine Street Inn regularly. While at the Shattuck Shelter, the father believed that the person sleeping in the bottom bunk of his bed was intentionally shaking the bed to keep him awake all night. He frequently used this experience to explain his presentation and difficulties during this time. The father lived with a friend in Medford for a period, but by the time of trial, the father would sleep around the Salvation Army, where he worked, or in a U-Haul storage unit. The father certainly deserves credit for the work he has done to address his financial situation; since January, 2020, he has worked at the Salvation Army in Somerville and has also picked up odd jobs on construction sites. At trial, the father testified that, if he received custody of the children, he and the children would be able to live with his sister. The judge, however, did not

credit this testimony given that the father admitted he had not spoken to his sister about this plan.

The father also has a long history of alcohol and substance misuse. At various times, the father has been dependent on alcohol, cannabis, Vicodin, and heroin. He maintained that he had been sober for over three years, but he had not consistently provided drug screens to corroborate this, and the judge did not credit his testimony on this point.

Towards the beginning of this proceeding, the father took steps to comply with his family action plan. Although the exact requirements of the action plan changed several times, some of the key requirements included completing a batterer's program, participating in individual therapy for his mental health and substance misuse, meeting with his primary care physician weekly for suboxone and drug screens, engaging in parenting support groups, following his medical providers' recommendations regarding medication, and pursuing stable housing.

The father completed a batterer's program. Despite this, he denied ever being abusive towards the mother. He also completed a Nurturing Father's Program and engaged in a coeducational parenting group. The judge, however, found that the father was later unable to identify what he learned from these parenting services. At the time of trial, the father was

7

engaging in individual therapy and suboxone treatment. At the same time, though, he was not completing the required drug screens, nor was he following his providers' recommendations about medication. The father also had not obtained appropriate housing.

3. The children's placements. After the department obtained temporary custody of the children, they were initially both placed in the care of foster parent (first foster mother). Shortly after they were placed with her, the first foster mother reported that Whitley exhibited aggressive behaviors towards Allen and that Whitley frequently threw tantrums and cried. As a result, Whitley was moved to a different foster home (respite home). Shortly after being placed in this respite home, Whitley had bruises on her arms, back and buttocks and disclosed to a department social worker that her respite foster mother physically abused her. Despite this, the department kept Whitley in this placement for another four days before moving her to a temporary placement. The department eventually placed Whitley with another foster parent (second foster mother). Whitley remained in the second foster mother's care for nearly four years. In April, 2022, the department returned Whitley to the care of the first foster mother, reuniting the two children.

Allen lived with the first foster mother from January, 2018 until December, 2022. While there Allen, at times, displayed inappropriate sexualized behaviors. Allen's therapist initially determined these behaviors were developmentally appropriate. These behaviors reemerged roughly one year later, and Allen was referred to and engaged in therapy.

In August, 2019, the department changed the children's permanency goal from reunification to adoption. When the trial began in March, 2022, the department had not yet identified a preadoptive resource for the children. During the course of the trial, the department identified a preadoptive family, and that family officially agreed to adopt the children in October, 2022. This family consists of a middle-aged couple with a dog and no children. They live in a two-floor home with a large fenced-in yard and enough bedrooms for each child to have their own room.

There is evidence in the record that the children moved into the preadoptive family's home in December, 2022, after the close of trial, but before the judge issued her findings of fact and conclusions of law in January 2024.

4. The father's visits with the children. The father has consistently attended visits with the children. These visits usually went well, the children responded positively to the visits, and the department had limited concerns about the

9

visits.  The father, at one point, had unsupervised visits with the children, but these became supervised when a department social worker observed the father crossing the street while mumbling and leaving the children to cross on their own.  The father has also acknowledged that he sometimes felt overwhelmed during visits.

5.  The Juvenile Court judge's decision.  Based on the father's mental health, history of substance misuse, housing instability, history of domestic violence and lack of insight into these issues, the Juvenile Court judge found that the father was unfit and that his unfitness was likely to continue undiminished in the future.  The judge also found that a significant relationship existed between the father and the children and ordered that the children receive posttermination and postadoption visits with the father at least four times per year.

Discussion.  "In a proceeding to commit a child to the custody of the department under G. L. c. 119, § 26, the department bears the burden of proving, by clear and convincing evidence, that a parent is currently unfit to further the best interests of a child and, therefore, the child is in need of care and protection."  Care & Protection of Erin, 443 Mass. 567, 570 (2005).  While the judge must find unfitness by clear and

convincing evidence, the judge's subsidiary findings need only be proven by a fair preponderance of the evidence. Adoption of Leland, 65 Mass. App. Ct. 580, 583 (2006). We will not disturb the judge's findings of fact unless they are clearly erroneous. Custody of Eleanor, 414 Mass. 795, 799 (1993). "A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed" (quotation and citation omitted). Id. We review a judge's decision to terminate parental rights for abuse of discretion or clear error of law. Adoption of Elena, 446 Mass. 24, 30 (2006).

1. The judge's findings. The father argues that several of the judge's findings are clearly erroneous. Therefore, he contends, the judge's finding of unfitness was not supported by clear and convincing evidence. All the findings he challenges were adequately supported by the record. Consequently, the judge's finding of unfitness was supported by clear and convincing evidence.

The father first challenges finding of fact no. 48. In this finding, the judge noted that several of the father's responses during his testimony were tangential and

11

nonresponsive, consistent with what department staff and his providers had reported about his presentation.

The judge found that, when asked which doctor he sees for his mental health, the father responded,

> "I went there for chemical dependency, so I started off where I got into an IOP and then I was let into therapy, and then because I was on a top bunk, which is a whole other story I don't want to get into, is why I was only sleeping two to three hours a night for one year, I was a walking insomniac and was dying."

The father argues that this statement made sense in the larger context of his testimony and the questions preceding this answer. Before this, the father was asked several questions about his doctors, what he sees them for, and how frequently he sees them. This context does not clarify this response. It was not clear error for the judge to conclude that the father's story about sleeping on the top bunk was nonresponsive and tangential.

Next, the judge quoted the father's response to a question about where he attended parenting classes in which he stated,

> "[T]he first one I was in the shelter, so every time I went on a Wednesday, I had to stay out that night because I couldn't go back at 8 o'clock . . . some nights I already knew I was going to be out in the city all night long in a dangerous area, I mean there's people that would be scared of just walking down certain areas and neighborhoods whereas, me, I walk with God and don't engage in anger or violence."

12

The father argues that even though this statement was not directly responsive to the question, it was related to it. According to the father, he wanted the judge to know that he attended parenting class even though he knew it meant he would not be able to return to the shelter on the nights he had class. The father's desire to inform the judge of this fact, however, does not make it clear error for the judge to have concluded that this statement was nonresponsive and tangential.

The judge also found that, in response to a question about who prescribed his medication, the father responded that it was his primary care physician, then continued to provide an unrelated story about his cell phones going missing while he was living on the street. The father again argues that context shows this statement was responsive. Here, though, the context makes this comment more tangential, rather than less. After stating that it was his primary care physician who prescribed him medication, the father went on to tell an unrelated story about wanting to get a driver's license before, without connecting the two stories, launching into his account of his cell phones going missing. There was no clear error in the judge's determination that this testimony was nonresponsive and tangential.

The judge found that the father's statement about calls with the children during the pandemic -- "they called me but there was still a time when I had absolute darkness that's spoken of in the Bible, so I was in that then" -- was tangential and nonresponsive. The father, again, tries to contextualize this statement in his surrounding testimony. Again, context does not help the father. The line of questioning that led to this response began with "what happened with COVID and visits?" While the father spoke at length about his experience during the pandemic, he struggled to address how the COVID-19 pandemic impacted his visits with the children. After being asked whether he had visits on the phone with his children, the father returned to the topic of how the pandemic impacted him by describing the "absolute darkness" he experienced. There was no clear error in finding that doing so was non-responsive and tangential. Nor, as the father suggests, did the judge equate his religious beliefs with mental illness, or rely upon those beliefs in her finding of unfitness.

The judge found that the father's response to a question about his nurse practitioner also demonstrated his presentation issues. When asked whether a certain provider was his nurse practitioner, the father stated, "This is the thing, is she the nurse practitioner or am I me working at the Salvation Army and

14

helping others? I don't know." There was no clear error in the judge's finding that this comment was nonresponsive and tangential.

The father's trial counsel asked him, "Why do you want [your children] back," and the father responded, as recounted in the judge's findings of fact, "Because the Bible says, you know, God says we have children to raise." (The actual transcript reads, "Because the bible says, you know, God says we have to and to raise"). The father claims that it was clear error for the judge to find that his statement was tangential and nonresponsive. He argues that this statement merely reflects his religious beliefs and how they influence his feelings about his responsibilities to his children. Given that the judge heard his testimony and witnessed his demeanor and that the testimony does not compel the father's construction of it, we cannot say it was clear error for the judge to conclude that this comment was also nonresponsive and tangential.

The father also challenges finding no. 158 in which the judge noted several comments the father made during clinical interviews. The father, however, misunderstands this finding. While he points to context and other testimony to argue that these statements should not have been viewed negatively or seen as significant, the judge merely found that the father made

15

these statements.  Given that the father does not dispute that he made them, he has not shown the judge's finding to be clearly erroneous.

The father also argues that it was clear error for the judge to find that he did not want to be "told how to live." When asked whether he had seen some of his family action plans, the father testified, "Yeah, but if you -- you can lean towards always saying, 'Hey, what do I do next?' Then that's -- I'm being told how to live . . . I don't want to be like that."  The father argues that the best reading of this testimony is that he did not always ask for his family action plans because he did not want to look like he needed to be told how to live.  The father's reasoning, however, does not render the judge's finding that he did not want to be told how to live -- for whatever reason -- clearly erroneous.

The father also disputes the judge's finding that he did not feel the need to meet with the Department monthly.  The father's testimony, though, directly supports this finding. After testifying that he did not meet with the department once a month, he stated, "[W]hen I get a text or a call, then I'll show up to anything, but until then, and then it can just be, well, why would someone need this?"  Based on this testimony, there

16

was no clear error in the judge's finding that the father did not feel the need to meet with the Department monthly.

2. Nexus between the father's mental health and ability to parent. A parent's "[m]ental disorder is relevant only to the extent that it affects the parents' capacity to assume parental responsibility, and ability to deal with a child's special needs" (citation omitted). Adoption of Luc, 484 Mass. 139, 146 (2020). The father argues that there is no nexus between his mental health and his ability to parent. The father also claims that the judge's finding that he needed to be on medication, which the judge relied on to conclude that he was unfit, is clearly erroneous.

At the outset, the judge never found that the father needed to be on medication. The father claims to find such a finding in the judge's conclusions of law. The judge did not state that the father needed to be on medication in her conclusions; she merely noted that the father refused to follow his providers' recommendations. The record and the judge's findings support that the father has refused to follow his providers' recommendations about psychiatric medication. To the extent the judge's conclusions incorporate or rely on findings to that effect, those findings are not clearly erroneous.

17

The judge also identified a sufficient nexus between the father's mental health and his ability to parent. The judge concluded that the father's symptoms -- including tangential thoughts and paranoia -- and his refusal to follow the recommendations of his providers would prevent him from engaging with the children's providers and ensuring that they get the services and treatment they need. The father's inability to ensure that the children receive appropriate services and treatment relates to his "ability to assume parental responsibility." Adoption of Luc, 484 Mass. at 146.

3. The father's action plan. The father argues that he substantially complied with his action plan. The judge concluded otherwise. The judge noted that, although the father had been compliant with portions of his plan, he refused to cooperate with anything he personally disagreed with, most notably his providers' recommendations about medication. The judge also concluded that, even though the father had participated in multiple parenting programs, he could not explain what he learned or demonstrate any insight into his parental shortcomings after attending these programs. The judge pointed out that the father still lacked stable housing. Finally, the judge noted that the father continued to deny his history of domestic violence towards the mother and refused to

take responsibility for the events leading to the children's removal. All these conclusions were supported by the record and the judge's findings and demonstrate the father's failure to comply with his action plan.

Regarding the father's housing instability in particular, the father points to testimony from one of the department's social workers that the department did not see the father's housing situation as a barrier to reunification. This testimony, though, only related to the period when the father was living with his friend in Medford. By the time of trial, the father had been asked to leave this house and was, at least at times, sleeping in a U-Haul storage unit. The father also testified that his sister would let him and the children stay with her if he regained custody. As described above, the judge did not credit this testimony, given that the father had not spoken to his sister about this plan. The judge's conclusion that the father lacked stable housing had support in the judge's findings and the record. Neither a Salvation Army store nor a storage unit amounts to stable housing.

4. Stale evidence. The father's final argument asserts that the judge's finding of unfitness rested on stale information about his history of domestic violence and mental health. "[S]tale information cannot be a basis for a

19

determination of current parental unfitness." Adoption of Rhona, 57 Mass. App. Ct. 479, 487 (2003), S.C., 63 Mass. App. Ct. 117 (2005). In this case, the judge did not rely on any stale information in finding the father unfit.

As to the father's history of domestic violence, the judge's conclusions focused on his lack of insight and failure to take responsibility for the conditions that led to the children's removal. The father's lack of insight into and unwillingness to accept responsibility for his past domestic violence is a current condition, even though the underlying acts of domestic violence happened in the past.

As far as the father's mental health, the judge also focused on the father's lack of insight into his mental health struggles, which, again, was a current condition. The judge also found that the father's trial testimony exhibited the same symptoms that the father's providers and department staff had reported. Given that the father suffered from these symptoms at the time of trial, as evidenced by his testimony, information about his mental health was not stale.

Consequently, there was ample support for the judge's finding of unfitness and no abuse of discretion or clear error of law in the judge's decision to terminate the father's parental rights.

20

5. <u>The children's placement</u>. Soon after assuming temporary custody of the children, the department placed Whitley in a respite foster home where the foster parent physically abused her. Despite viewing bruises on Whitley and learning from her that the respite foster parent abused her, the department returned Whitley to the respite foster parent's care for four days. At times in this proceeding, then, it appears that while in the department's custody, Whitley, was neither cared for nor protected. We trust, though, that the juvenile court judge has ensured that the adoption plan for both children is in both of their best interests.

<u>Decrees affirmed</u>.

By the Court (Rubin, Shin & Hodgens, JJ.[3]),

Paul Little

Clerk

Entered: April 25, 2025.

---

[3] The panelists are listed in order of seniority.